IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

THE STATE OF ARIZONA,
*Petitioner/Appellant,*

*v.*

EFREN MEDINA,
*Respondent/Appellee.*

No. CR-10-0031-AP
Filed August 22, 2013

Appeal from the Superior Court in Maricopa County
The Honorable Christopher T. Whitten, Judge
No. CR1993-008378
**AFFIRMED**

COUNSEL:

Thomas C. Horne, Arizona Attorney General, Kent E. Cattani, former Chief Counsel, Criminal Appeals/Capital Litigation, Jeffrey A. Zick, Chief Counsel, Criminal Appeals/Capital Litigation, John Pressley Todd, Assistant Attorney General (argued), Phoenix, for State of Arizona

David Goldberg, Attorney at Law (argued), Fort Collins, CO, for Efren Medina

JUSTICE ROBERT BRUTINEL authored the opinion of the Court, in which CHIEF JUSTICE BERCH, VICE CHIEF JUSTICE BALES, JUSTICE PELANDER, and JUSTICE TIMMER joined.

JUSTICE BRUTINEL, opinion of the Court:

¶1 Efren Medina was convicted in 1995 of first degree murder, third degree burglary, and aggravated robbery. The trial judge sentenced him to death for the murder and to prison terms for the other crimes, and we affirmed on appeal. *State v. Medina*, 193 Ariz. 504, 975 P.2d 94 (1999). In 2003, the trial court granted Medina's petition for post-conviction relief ("PCR"), which had alleged ineffective assistance of counsel at sentencing,

and vacated Medina's death sentence.

¶2     At the 2008 resentencing trial, the jury found four aggravating factors, but could not agree on the sentence. The judge declared a mistrial. In 2009, a second penalty phase trial concluded with the jury determining that Medina should be sentenced to death. We have jurisdiction over this automatic appeal under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1).[1]

## I. FACTUAL BACKGROUND

¶3     Just after midnight on September 30, 1993, Frazier Giles got out of bed to open a window. In the parking lot across the street, he saw a person sitting in his neighbor's car with the door open and the headlights on. Giles noticed what he thought was a "pile of rags" beside the car. A few minutes later he heard someone say, "Please don't hit me. Don't hit me. Don't. Don't." Giles returned to the window and saw a second car drive up and stop next to his neighbor's vehicle. The driver spoke to the person in the parked car for a few minutes before leaving.

¶4     The person in the parked car turned off the headlights, got out of the car, stomped on the "pile of rags," and then dragged the pile into the street. At that point, Giles realized that the "pile of rags" was a person. The second car returned and the person who had dragged the body got inside. The car sped away, but then came "racing back" and ran over the body with both the front and back wheels. Giles left the window to call the police.

¶5     Medina's girlfriend, Angela Calderon, testified that about two hours later, she and a friend were sitting in her front yard when three men arrived in Medina's car. Medina got out of the driver's side and Ernest Aro stepped out from the passenger side. Kevin Martinez remained in the backseat. Medina and Aro appeared intoxicated and were "laughing and giggling." Calderon asked why they were laughing, and Medina told her to "watch the news" for a "speed bump" or "tire markings." Medina also simulated driving over a speed bump and made "varoom, bump, bump" noises.

---

[1]     Unless otherwise noted, we cite the current version of statutes that have not materially changed since Medina committed his crimes.

¶6 Medina met Calderon at a friend's house later that morning, where he told her that "he was scared, because they had done something wrong." Medina said that he and his friends had been riding in the car when they decided to steal another car. Medina admitted pulling the car's occupant out of the vehicle and hitting and kicking him. Martinez and Medina attempted to hot-wire the car and steal the radio but were unsuccessful. Medina then pulled the man into the street.

¶7 Medina also told Calderon that Aro had driven off, assuming that Medina and Martinez would follow in the stolen vehicle, but when they did not, Aro returned to pick them up. Medina got in the driver's seat after telling Aro to scoot over. Medina drove off, then came back and ran over the victim three times, going forward over him, then reversing over him and going forward again.

¶8 Other evidence linked Medina to the murder. At the scene, investigators found a plastic bag wet with gold paint and tire marks in gold paint showing that Medina's car had traveled both eastbound and westbound. Medina's fingerprints were found in the victim's car, and it appeared that someone had tried to remove the radio.

¶9 The police searched Medina's car and found the victim's watch, hair, blood, tissue, and clothing fragments in the undercarriage, as well as spatters of gold paint. In Medina's bedroom, the police found another plastic bag filled with gold paint.

## II. ISSUES ON APPEAL

### A.    Denial of Medina's PCR and Motion to Suppress

¶10 Medina argues that the trial court abused its discretion by denying his second PCR without holding an evidentiary hearing and refusing to suppress the evidence found as a result of a search warrant. After the trial court vacated Medina's death sentence and ordered resentencing in 2003, Medina filed a second PCR in December 2005, claiming to have found newly discovered evidence about Frazier Giles's testimony and evidence that the search warrant authorizing searches of Medina's home and car was unsigned, making the searches illegal. The trial court denied relief without holding an evidentiary hearing. Medina did not seek review of the denial of this second PCR. At Medina's retrial in 2008, he moved to suppress the evidence discovered as a result of the search warrant for the

same reasons alleged in his second PCR; the trial court denied the motion.

¶11     The State contends that Medina is precluded from raising the issue whether the trial court abused its discretion by denying his PCR because he did not seek review of the denial of his PCR, as required by Arizona Rule of Criminal Procedure 32.9(c). We agree.

¶12     In any event, the trial court did not abuse its discretion in denying the PCR. The PCR asserted that, in 2004, nine years after the first trial, an attorney from the Maricopa Public Defender's Office interviewed Giles, the eyewitness to the murder. In the 2004 interview, Giles stated (contrary to his testimony in the first trial) that the person who had dragged the victim into the street was not in the car when it ran over the body. By 2004, however, Giles had been diagnosed with Alzheimer's disease, and when he was deposed in 2006, Giles had no memory whatsoever of the murder or the 2004 interview.

¶13     To obtain a new trial based on newly discovered evidence, a petitioner must meet five requirements:

> (1) it must appear from the motion that the evidence relied on is, in fact, newly discovered, i.e., discovered after the trial; (2) the motion must allege facts from which the court can infer due diligence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) the evidence must be material to the issue involved; and (5) it must be evidence that would probably change the verdict if a new trial were ordered.

*State v. Fisher*, 141 Ariz. 227, 251, 686 P.2d 750, 774 (1984). "Further, if the motion relies on the existence of a witness willing to testify and present the new evidence at a new trial, such witness must appear to be credible to the trial judge hearing the motion." *Id.*

¶14     Giles's proffered testimony does not meet these requirements. The changes in his testimony could have been discovered before trial. Furthermore, Giles was not a credible witness in 2006. By that time, he had been diagnosed with and had suffered from Alzheimer's disease for several years, which the trial court found had "tainted significantly" Giles's 2004 version of the events. By 2006, when he was deposed for the PCR, Giles could not remember any of the events. We find no abuse of

4

discretion in dismissing the claim as to Giles's testimony without an evidentiary hearing.

¶15    As for the lack of a signed warrant, Medina was precluded from raising this issue in his second PCR under Arizona Rule of Criminal Procedure 32.2(a)(3), which states that a defendant is precluded from post-conviction relief if the ground for relief "has been waived at trial, on appeal, or in any previous collateral proceeding."  *See also* A.R.S. § 13-4232(A)(3); Ariz. R. Crim. P. 32.2 cmt..  Medina could have raised the absence of a signed warrant at his original 1995 trial or his 1999 appeal to this Court; by not doing so, he waived this issue.

¶16    The trial court did not abuse its discretion in denying Medina's PCR and his motion to suppress.

**B.    Double Jeopardy and Cruel and Unusual Punishment**

¶17    Medina argues that A.R.S. § 13-752(K) is unconstitutional because permitting a retrial after a hung jury in the penalty phase violates double jeopardy and is cruel and unusual punishment.  "We review constitutional issues de novo, and, when possible, construe statutes to uphold their constitutionality."  *State v. Hausner*, 230 Ariz. 60, 82 ¶ 99, 280 P.3d 604, 626 (2012).

¶18    Section 13-752(K) provides that if the penalty phase jury "is unable to reach a verdict, the court shall dismiss the jury and shall impanel a new jury," which shall not retry the defendant's guilt or aggravating circumstances unanimously found by the first jury.  "If the new jury is unable to reach a unanimous verdict, the court shall impose a sentence of life or natural life on the defendant."  *Id.*

¶19    "Normally, 'a retrial following a "hung jury" does not violate the Double Jeopardy Clause.'"  *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003) (quoting *Richardson v. United States*, 468 U.S. 317, 324 (1984)); *see State v. Johnson*, 155 Ariz. 23, 27, 745 P.2d 81, 85 (1987) ("[A] retrial before a new jury of an issue on which a former jury could not reach agreement does not violate double jeopardy principles.").  "[A] jury's inability to reach a decision is the kind of 'manifest necessity' that permits the declaration of a mistrial and the continuation of the initial jeopardy that commenced when the jury was first impaneled."  *Yeager v. United States*, 557 U.S. 110, 118 (2009).

¶20 "[T]he touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'" *Sattazahn*, 537 U.S. at 109. There was no acquittal here. The jury, by failing to reach a sentencing verdict, did not conclude that the State failed to prove its case beyond a reasonable doubt. Thus, the jury's inability to agree on the sentence did not "acquit" Medina of a death sentence. *Cf. id.* at 109 (finding there was no acquittal when jury hung as to penalty because the jury did not make any findings concerning the alleged aggravating circumstance).

¶21 Medina argues that because the 2008 jury hung on the appropriate penalty, at least one juror must have found that the mitigating circumstances outweighed the aggravating factors and we must give this finding effect under *McKoy v. North Carolina*, 494 U.S. 433 (1990), and *Mills v. Maryland*, 486 U.S. 367 (1988). We disagree; even if some jurors reached this conclusion, it would not preclude a retrial under either *McKoy* or *Mills*. Like the jury in *Sattazahn*, the 2008 jury did not make formal findings regarding mitigating factors.

¶22 Moreover, the Arizona death penalty scheme meets the requirements of *McKoy* and *Mills* that each juror be allowed to give effect to the mitigating evidence he or she individually finds to be proven. *McKoy*, 494 U.S. at 444; *Mills*, 486 U.S. at 374. Arizona's scheme does not require a mitigating factor to be found unanimously by the jury. A.R.S. § 13-751(C).

¶23 Medina also characterizes the trial court's granting of the first PCR in 2003 as an acquittal that bars further retrials. The court then found "a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." This is not equivalent to a ruling that life was the appropriate sentence or an acquittal on the merits. *See State v. Ring* (*Ring III*), 204 Ariz. 534, 551 ¶ 40, 65 P.3d 915, 932 (2003) ("A capital defendant whose original sentence is vacated on appeal can be resentenced to death so long as the defendant has not been 'acquitted' of the death sentence."). Medina's retrial did not violate the Double Jeopardy Clause.

¶24 Medina also argues that Arizona's procedures for a retrial after a hung jury in the penalty phase constitute cruel and unusual punishment because most states do not authorize retrial if a jury cannot agree on a death sentence. In analyzing this issue, we first "determine whether there

is a national consensus against the sentencing practice at issue." *Graham v. Florida*, 130 S. Ct. 2011, 2022 (2010). Then, looking to the "'Eighth Amendment's text, history, meaning, and purpose,' the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008)).

¶25 Most states that have the death penalty require the trial court to impose a life sentence if the penalty-phase jury cannot reach a unanimous decision. Assuming without deciding that this represents a "national consensus" against a penalty phase retrial in these circumstances, this Court still must exercise independent judgment as to whether that practice violates the Eighth Amendment. *Id.*

¶26 In general, allowing retrials does not subject a defendant to cruel and unusual punishment. *People v. Terry*, 454 P.2d 36, 41–42 (Cal. 1969); *Harris v. State*, 539 A.2d 637, 644 (Md. 1988). No federal or state decision has held that retrial after a hung jury in the penalty phase constitutes cruel and unusual punishment or that the United States Constitution requires the imposition of a life sentence after a hung penalty-phase jury. Medina characterizes *Kansas v. Marsh*, 548 U.S. 163 (2006) as holding that defaulting to a life sentence when a jury hangs in the penalty phase is a necessary part of a constitutional death penalty scheme. However, *Marsh* upheld the entirety of the Kansas capital scheme without stating or suggesting that such a "default" rule was itself constitutionally required. *Id.* at 178.

¶27 The Arizona Legislature has chosen to allow one sentencing retrial of a capital defendant after a hung penalty-phase jury and to require imposition of a life sentence if the new jury cannot reach a unanimous decision. *See* A.R.S. § 13-752(K). Some other states that allow retrial after a hung jury permit more than one retrial if the second jury also hangs. *See* Cal. Penal Code § 190.4(b); Nev. Rev. Stat. § 175.556(1).

¶28 Imposing death on a defendant who succeeds in having his court-imposed death sentence reversed in post-conviction proceedings and for whom the first penalty-phase jury was unable to reach a decision is not disproportionate punishment. The Supreme Court has found that death is categorically disproportionate for certain offenders, *see Roper v. Simmons*, 543 U.S. 551, 578 (2005) (precluding death penalty for defendants younger than eighteen at time of the crime); *Atkins v. Virginia*, 536 U.S. 304, 321

(2002) (prohibiting death penalty for "mentally retarded criminals"), and non-homicide crimes against a person, *see, e.g.*, *Kennedy*, 554 U.S. at 437 (disallowing death penalty for crime of rape). But the Court grounded these holdings in determinations that the punishment, considering the characteristics of the offender and the crime, was disproportionate to any recognized penal goals. *Cf. Graham*, 130 S. Ct. at 2028 (noting that penological justifications for the sentencing practice are also relevant to the analysis). No such conclusion can be drawn with regard to defendants like Medina merely because they have successfully challenged their death sentences in post-conviction proceedings or a penalty-phase jury is unable to reach a verdict. We hold that § 13-752(K)'s provision for retrial after a hung penalty-phase jury does not result in cruel and unusual punishment.

## C.  Dismissal of Jurors by Stipulation

**¶29**  Medina argues that the trial court erred when it accepted, over his objection, a stipulation by counsel to dismiss jurors based solely on their questionnaire answers. "We review a trial court's rulings on *voir dire* of prospective jurors for abuse of discretion." *State v. Glassel*, 211 Ariz. 33, 45 ¶ 36, 116 P.3d 1193, 1205 (2005), *opinion corrected on denial of reconsideration*, 211 Ariz. 370, 121 P.3d 1240 (2005).

**¶30**  In Medina's 2008 trial, defense counsel and the State stipulated to release certain jurors based on their questionnaire answers. The trial court initially stated that it would require Medina's agreement on the record, but later decided trial counsel could stipulate to release jurors as part of trial strategy. Trial counsel and the State agreed to dismiss sixty jurors. Medina objected, saying that he had not seen any of the questionnaires and wished to try to rehabilitate the jurors.

**¶31**  "[T]he Sixth Amendment is violated if the trial jury in a capital case is chosen by excluding for cause persons who have general objections to the death penalty." *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 318 ¶ 6, 4 P.3d 369, 373 (2000). In *Anderson I*, we held that a defendant has a right to question potential jurors orally and attempt to rehabilitate them, *id.* at 320 ¶ 13, 4 P.3d at 375, but we emphasized that "our holding today does not prevent excluding prospective jurors for cause based solely on answers to a written questionnaire when the adverse party fails to object, or when all parties consent to exclusion," *id.* at 324 ¶ 24, 4 P.3d at 379. Accordingly, the attorneys in this case could stipulate to the dismissal of jurors. But we must still decide whether Medina's objection should override his counsel's

stipulation.

¶32    A defendant has exclusive control over the key decisions "whether to plead guilty, whether to waive a jury trial and whether to testify. Beyond these matters, most trial decisions are trial strategy resting with counsel." *State v. Nirschel*, 155 Ariz. 206, 208, 745 P.2d 953, 955 (1987) (citation omitted).

¶33    Because voir dire involves strategic decisions by trial counsel, we decline to hold that it is within the defendant's exclusive control. *See, e.g.*, *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001); *People v. Manning*, 948 N.E.2d 542, 550 (Ill. 2011) ("[D]ecisions made during jury selection involve trial strategy to which courts should be highly deferential."). Counsel's trial strategy could be undermined by allowing the defendant to override counsel's tactical decisions. If the defendant controlled all voir dire decisions, defense counsel's ability to manage the trial would be compromised, resulting in inevitable delay and confusion. *See Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("The adversary process could not function effectively if every tactical decision required client approval.").

¶34    "[C]ounsel acting alone may make decisions of strategy," even if those decisions involve constitutional rights. *State v. Levato*, 186 Ariz. 441, 444, 924 P.2d 445, 448 (1996). A defendant is bound by counsel's trial strategy "so long as counsel's assistance at trial was not reduced to a mere 'farce or sham.'" *State v. (John L.) Jones*, 110 Ariz. 546, 550, 521 P.2d 978, 982 (1974), *overruled on other grounds by State v. Conn*, 137 Ariz. 148, 669 P.2d 581 (1983). Medina has not shown, nor does the record suggest, that his counsel's assistance was a sham. Thus, Medina is bound by his counsel's decision to stipulate to removal of the jurors.

¶35    Medina contends that the trial court had a duty to protect his rights to a fair and impartial jury and accordingly should have rejected the stipulation. A trial court, however, has no general duty or authority to second-guess the strategic decisions by trial counsel. Absent facts suggesting that counsel's assistance was a sham or otherwise patently deficient, the trial court did not abuse its discretion by accepting counsel's stipulation regarding voir dire, even over Medina's objection.

**D.    Removal of Jurors 88 and 30**

¶36    Medina argues that Juror 88 from the 2008 trial and Juror 30 from

the 2009 trial were improperly removed for cause. "We review a trial court's decision to strike a potential juror for cause for abuse of discretion." *State v. Velazquez*, 216 Ariz. 300, 306 ¶ 13, 166 P.3d 91, 97 (2007). But if the defendant did not object to the dismissal, it is reviewed for fundamental error. *State v. Roseberry*, 210 Ariz. 360, 366 ¶ 26, 111 P.3d 402, 408 (2005).

1.     Juror 88

¶37     Juror 88 answered equivocally whether she could vote for the death penalty. She cried and trembled throughout the questioning. The court granted the State's motion to dismiss Juror 88 because "her views about the death penalty and just her whole demeanor just would tell anybody that watched her that her views would substantially impair her ability to fairly consider both options." Medina did not object to her removal.

¶38     A juror is properly excused for cause "if the juror's views would 'prevent or substantially impair the performance of his duties as a juror.'" *State v. (Robert G.) Jones*, 197 Ariz. 290, 302 ¶ 24, 4 P.3d 345, 357 (2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)); *see* Ariz. R. Crim. P. 18.4(b). We defer to the trial court's assessment, even when a juror's answer by itself would not "'compel the conclusion that he could not under any circumstance recommend the death penalty,' . . . because so much may turn on a potential juror's demeanor." *Uttecht v. Brown*, 551 U.S. 1, 8 (2007) (quoting *Darden v. Wainwright*, 477 U.S. 168, 178 (1986)).

¶39     Juror 88 was shaking and crying throughout the interview, which convinced the trial court that she could not handle involvement in the case. In these circumstances, the court did not err, much less commit fundamental error, in dismissing Juror 88 for cause.

2.     Juror 30

¶40     Although Juror 30 initially told the prosecution and the defense that she could apply the law and consider both a life and death sentence, she later said she was uncomfortable with the prospect that a person's life would be in her hands and did not think she could sign a death verdict.

¶41     The State moved to dismiss Juror 30 for cause. Medina objected, arguing that she would only be required to sign the form if she were the foreperson. The court questioned whether Juror 30 could be empanelled

"with the instruction that she not be allowed to be the foreperson" and noted that, in any event, she would have to stand and be polled. After this discussion, the court granted the motion, finding that "her answer suggested that . . . her ability to decide this case, to decide the law and the facts would be substantially impaired by her resisting views."

¶42 Even in the face of Juror 30's earlier claims that she could apply the law, the trial court did not abuse its discretion by concluding this juror's stated discomfort with voting for a death verdict would impair her ability to sit as a juror. *See Glassel*, 211 Ariz. at 48 ¶ 50, 116 P.3d at 1208 ("[E]ven assuming that juror 16 was sincere about being able to apply the law, the judge could have reasonably determined that the juror's views would substantially impair his ability to deliberate impartially.").

E.      **Batson Challenges**

¶43 Medina argues that the trial court erred in denying his challenges, based on *Batson v. Kentucky*, 476 U.S. 79 (1986), to the State's peremptory strikes of Jurors 35, 71, and 73. We will sustain a trial court's rulings on *Batson* challenges unless they are clearly erroneous. *State v. Gallardo*, 225 Ariz. 560, 565 ¶ 10, 242 P.3d 159, 164 (2010).

¶44 "Racially discriminatory use of a peremptory strike violates the Equal Protection Clause of the Fourteenth Amendment." *State v. Hardy*, 230 Ariz. 281, 285 ¶ 12, 283 P.3d 12, 16 (2012). "A *Batson* challenge involves three steps: (1) The defendant must make a prima facie showing of discrimination, (2) the prosecutor must offer a race-neutral reason for each strike, and (3) the trial court must determine whether the challenger proved purposeful racial discrimination." *Id*. "Although not dispositive, 'the fact that the state accepted other [minority] jurors on the venire is indicative of a nondiscriminatory motive.'" *State v. Roque*, 213 Ariz. 193, 204 ¶ 15, 141 P.3d 368, 379 (2006) (alteration in original) (quoting *State v. Eagle*, 196 Ariz. 27, 30 ¶ 12, 992 P.2d 1122, 1125 (App. 1998)).

¶45 By asking the prosecutor to give race-neutral reasons for striking these jurors, the trial court implicitly found that Medina had made a prima facie showing of discrimination. *See Hardy*, 230 Ariz. at 286 ¶ 13, 283 P.3d at 17. The prosecutor stated that she moved to strike Juror 35 based on her youth, her high school education, her belief that some of her friends had been punished too harshly for crimes, her friendship with gang members and drug users, her initial reluctance to accept the prior

jury's verdict, and her opposition to the death penalty. The trial court found that Medina had not carried his burden and denied the *Batson* challenge.

¶46 The prosecutor struck Juror 71 because she was young and lacked life experience, she held low-level positions, her aunt had been investigated and cleared by Child Protective Services, her friends used marijuana, she would be upset by the crime scene photographs, and she was opposed to the death penalty. The court denied the challenge because the explanations were race-neutral.

¶47 The prosecutor stated that she struck Juror 73 because her uncle was a doctor of psychology and "a life coach for most of [her] family," she had experience with people who used illegal drugs, and her husband was diagnosed with deep depression. Because the prosecutor anticipated testimony about Medina's diagnosis of depression, the prosecutor was worried Juror 73 might not be able to "separate her involved life experiences." Medina disputed this explanation, pointing out that non-minority jurors who "voiced similar concerns about drug and alcohol problems" were not struck. The court noted it was supposed to "evaluate the credibility of the striking party" and denied the *Batson* challenge, "based on [his] assessment of everything."

¶48 Medina now asks this Court to rule that "comparative juror analysis is a constitutionally required aspect of *Batson* review." However, the United States Supreme Court has warned that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). Moreover, we disagree with Medina's contention that our decision in *Hardy* implicitly requires a comparative analysis for every *Batson* challenge. In *Hardy*, we examined similarities between dismissed minority jurors and non-minority jurors who remained on the panel, which were both raised by the defendant and addressed by the prosecutor at trial. 230 Ariz. at 286 ¶¶ 13–14, 283 P.2d at 17. *Hardy*, however, did not require every court reviewing a *Batson* claim to use a comparative analysis, and we decline to do so when the similarities between peremptorily stricken jurors and those remaining on the panel were not raised at trial.

¶49 In this case, although Medina argued that non-minority jurors who were not stricken had similar problems concerning drugs, he did not

direct the court to specific similarly situated jurors. Thus, the prosecutor had no opportunity to offer distinctions between allegedly similarly situated jurors or to clarify which factors were given more weight in the choice to strike. Likewise, the trial court did not have an opportunity to conduct an in-depth comparison of the jurors who were stricken and those who remained on the panel. We decline to examine more detailed comparisons than were alleged at trial. The trial court found that Medina had not carried his burden of showing purposeful discrimination. Because Medina did not argue that any juror on the panel had some or all of the factors for disqualification presented for Jurors 35, 71, and 73, we do not find that the trial court clearly erred.

¶50 Additionally, at the conclusion of the peremptory strikes, defense counsel noted that four or five minority jurors remained on the panel. The presence of other minority jurors on the panel is evidence of the State's nondiscriminatory motive. *See id.* ¶ 15 (noting that three minority jurors remained on the panel). For these reasons, the trial court did not clearly err in rejecting Medina's *Batson* challenges.

## F.    Admission of the Autopsy Report

¶51 Medina contends that admitting the victim's autopsy report without the opportunity to cross-examine the report's author and allowing another medical examiner to testify using facts from the report violated the Sixth Amendment's Confrontation Clause.

¶52 The autopsy report prepared by Dr. Ann Bucholtz detailed the victim's injuries and determined that the death was a homicide caused by blunt force trauma. Dr. Bucholtz did not testify at trial. Instead, the State called Dr. Philip Keen, who testified concerning the report's conclusions and used the report and photographs of the body to make various independent conclusions about the death.

¶53 We review interpretations of the Confrontation Clause de novo and analyze a properly-objected-to violation of the Confrontation Clause for harmless error. *State v. Bocharski*, 218 Ariz. 476, 485–86 ¶¶ 33, 38, 189 P.3d 403, 412–13 (2008). Assuming that Medina properly raised his Confrontation Clause objection to the report (an issue disputed by the parties), we reject his arguments because we find the report is not testimonial.

**¶54** "The Confrontation Clause bars admission of out of court testimonial evidence unless the defense has had an opportunity to cross-examine the declarant." *State v. Parker*, 231 Ariz. 391, 402 ¶ 38, 296 P.3d 54, 65 (2013) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). Testimonial evidence is "*ex parte* in-court testimony or its functional equivalent . . . such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Crawford*, 541 U.S. at 51. "A document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2717 (2011) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009)).

**¶55** Public or business records generally are not testimonial because they are usually "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Melendez-Diaz*, 557 U.S. at 324; *see also Crawford*, 541 U.S. at 56 (noting that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial — for example, business records"). Yet, the admission of a document "under a hearsay exception does not negate consideration of the Confrontation Clause." *State v. Huerstel*, 206 Ariz. 93, 102 ¶ 29, 75 P.3d 698, 707 (2003). When public records are "prepared specifically" for use at trial, the records are "subject to confrontation under the Sixth Amendment." *Melendez-Diaz*, 557 U.S. at 324.

**¶56** The United States Supreme Court has not determined whether an autopsy report is testimonial, but its most recent decision on the Confrontation Clause informs our analysis. In *Williams v. Illinois*, the state's expert "testified that a DNA profile produced by an outside laboratory . . . matched a profile produced by the state police lab using a sample of [the defendant's] blood." 132 S. Ct. 2221, 2227 (2012). The DNA report itself was not admitted into evidence. *Id.* The defendant argued that the portions of the expert's testimony referring to the laboratory report violated his right to confrontation. *Id.*

**¶57** The Court found that the report was nontestimonial; however, no one rationale was supported by a majority of the Court. If no opinion garners the support of a majority, the "position taken by those Members who concurred in the judgments on the narrowest grounds" is regarded as the holding of the Court. *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

**¶58**    The plurality opinion authored by Justice Alito concluded that the expert's statements did not violate the Confrontation Clause because the laboratory report was not testimonial. *Williams*, 132 S. Ct. at 2228. The plurality declared that the Confrontation Clause prohibits formalized "out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Id.* at 2242. Because the "primary purpose" of the report "was to catch a dangerous rapist who was still at large," not to gather evidence against the defendant, and because the authors of the report could not know whether it would incriminate or exonerate the defendant, it was not testimonial. *Id.* at 2243–44.

**¶59**    Justice Thomas concurred solely in the judgment. *Id.* at 2255 (Thomas, J., concurring). He did not agree with the test used by the plurality; instead, he concluded the report was nontestimonial because it "lack[ed] the solemnity of an affidavit" and "was not the product of any sort of formalized dialogue resembling custodial interrogation." *Id.* at 2260.[2]

**¶60**    Neither the plurality's "primary purpose" test nor Justice Thomas's solemnity standard can be deemed a subset of the other; therefore, there is no binding rule for determining when reports are testimonial. *See United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (holding that when no "single standard . . . legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land").

**¶61**    Under the plurality test, the autopsy report here is not testimonial because its purpose was not primarily to accuse a specified individual. "We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." *Williams*, 132 S. Ct. at 2243.

**¶62**    Here, the autopsy was conducted the day after the murder, before Medina became a suspect. Any trace evidence obtained during the autopsy was gathered to determine the manner and cause of death in order to help "catch a dangerous [murderer] who was still at large," not to gather evidence to accuse Medina. *Id.; see also People v. Leach*, 980 N.E.2d

---

[2]    The dissent concluded that the report was testimonial because it was "meant to serve as evidence in a potential criminal trial." *Williams*, 132 S. Ct. at 2275 (Kagan, J., dissenting).

570, 590 (Ill. 2012). *Compare United States v. James*, 712 F.3d 79 (2d Cir. 2013) (discussing *Williams* and concluding autopsy report was not testimonial), *with United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) (concluding, given circumstances of preparation, that autopsy report was testimonial).

¶63 The autopsy report in this case is also nontestimonial using the solemnity test from Justice Thomas's concurring opinion. *Williams*, 132 S. Ct. at 2260. Justice Thomas found that the DNA report in *Williams* was nontestimonial because it was "neither a sworn nor a certified declaration of fact" and "it was not the product of any sort of formalized dialogue resembling custodial interrogation." *Id.* Like the report in *Williams*, the autopsy report in this case does not "certify[] the truth of the analyst's representations." *Id.* The signed report details the conditions of the body, states the examiner's conclusions regarding the cause and manner of death, and certifies that the report reflects her opinion as to the cause and manner of death and that she took charge of the body. The autopsy report does not certify that the report was correct or that she followed the correct procedures. *See People v. Dungo*, 286 P.3d 442, 449 (Cal. 2012) (stating that statements in an autopsy report "are less formal than statements setting forth a pathologist's expert conclusions"). Nor did the autopsy report arise from a formal dialogue akin to custodial interrogation. Therefore, we hold that the autopsy report is nontestimonial.

¶64 Medina also argues that the admission of Dr. Keen's testimony violated Medina's right to confrontation. Having concluded that the autopsy report is nontestimonial, we hold that Dr. Keen's testimony regarding the report did not violate the Confrontation Clause. The portions of Dr. Keen's testimony concerning his independent conclusions also did not violate the Confrontation Clause under our prior decisions. *See State v. Dixon*, 226 Ariz. 545, 553 ¶ 36, 250 P.3d 1174, 1182 (2011), *cert. denied*, 132 S. Ct. 456 (2011) ("Our cases teach that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as he forms his own conclusions."); *see also State v. Joseph*, 230 Ariz. 296, 299 ¶ 11, 283 P.3d 27, 30 (2012), *cert. denied*, 133 S. Ct. 936 (2013); *State v. Gomez*, 226 Ariz. 165, 169–70 ¶ 22, 244 P.3d 1163, 1167–68 (2010).

## G. Juror's Extra-Judicial Contact

¶65 Medina argues that the trial court's failure to interview a juror who

had contact with the victim's daughter constituted structural error that mandates reversal of his death sentence. When the extra-judicial contact was brought to the court's attention, the trial court questioned the victim's daughter about her conversation with the juror. She stated that she was in the elevator with the juror and a lawyer when the lawyer abruptly walked out of the elevator. She commented about the lawyer's compliance with the admonition. She did not realize at the time that the person she spoke with was a juror in the case and they did not discuss anything about the case. The trial court told the victim's daughter to avoid talking to anyone with a juror badge in the future but did nothing further regarding the incident. Medina's trial counsel did not object to the trial court's decision concerning the extra-judicial contact but Medina himself objected and moved for a new trial, which the trial court denied.

¶66 Medina is bound by his counsel's strategic decision to not object to a possible error by the trial court. *See State v. Corrales*, 138 Ariz. 583, 595, 676 P.2d 615, 627 (1983) (stating that "a defendant may be bound by his counsel's trial strategy decision to waive even constitutional rights"). By not requesting any further action, Medina's trial counsel waived this issue and did not need Medina's consent to do so. *See Levato*, 186 Ariz. at 444, 924 P.2d at 448 ("[C]ounsel acting alone may make decisions of strategy pertaining to the conduct of the trial.").

¶67 We reject Medina's contention that this alleged error constitutes structural error. Medina does not allege that the juror was actually biased as a result of the contact, nor does he cite any evidence in the record to support a finding of bias. Absent any evidence of juror bias, this alleged error is not one of the "relatively few" recognized structural errors. *See Ring III*, 204 Ariz. 552–53 ¶ 46, 65 P.3d at 933–34. Because Medina's counsel did not object to the trial court's handling of the matter, we review for fundamental error. *See State v. Davis*, 206 Ariz. 377, 390 ¶ 62, 79 P.3d 64, 77 (2003). Given the brevity of the contact between the juror and the victim's daughter and the absence of any discussion concerning the case or the defendant, it was not error, much less fundamental error, for the trial court to take no further action than questioning the victim's daughter.

## H. A.R.S. § 13-752(G) and the Ex Post Facto Prohibition

¶68 Medina argues that applying the 2009 version of A.R.S. § 13-752(G) in his case violates the ex post facto clause because that version allows the

sentencer to consider more evidence than the statutory scheme in effect at the time of the 1993 murder. The trial court denied Medina's motion to use the prior statute instead of § 13-752(G).

**¶69** "The ex post facto doctrine prohibits a state from 'retroactively alter[ing] the definition of crimes or increas[ing] the punishment for criminal acts.'" *Ring III*, 204 Ariz. at 545 ¶ 16, 65 P.3d at 926 (alterations in original) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). Medina argues that the 2009 version of § 13-752(G) is an ex post facto law because it "changes the rules of evidence by which less or different testimony is sufficient to convict than was then required." *Duncan v. Missouri*, 152 U.S. 377, 382 (1894). We are not persuaded.

**¶70** When Medina committed the murder in 1993, Arizona law provided that either side could "rebut any information received at the [aggravation/mitigation] hearing" and could present "[a]ny information relevant to any mitigating circumstances . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials." A.R.S. § 13-703(C) (1993). Under A.R.S. § 13-752(G) (2009), "the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency" and "the state may present any evidence that demonstrates that the defendant should not be shown leniency."

**¶71** To the extent that § 13-752(G) changed the evidence admissible at the penalty phase, it does not provide that "less or different testimony is sufficient to convict." *Duncan*, 152 U.S. at 382. As Medina concedes, the legal standard for sentencing a defendant to death has remained the same. Therefore, A.R.S. § 13-752(G) is not an ex post facto law.

**¶72** Medina argues that even if the 2009 version of § 13-752(G) did not substantively change the criminal law, the new statute was a procedural change that affected his rights. A legislative change to criminal procedure "generally does not violate the Ex Post Facto Clause," even if it disadvantages a defendant, *Ring III*, 204 Ariz. at 546 ¶ 17, 65 P.3d at 927, unless "it affects 'matters of substance, by depriving a defendant of substantial protections with which the existing law surrounds the person accused of crime,'" *id.* at 547 ¶ 24, 65 P.3d at 928 (quoting *Collins*, 497 U.S. at 45).

**¶73** In *Ring III*, we held that a change in criminal procedure allowing a

jury, rather than a judge, to decide the sentence did not affect matters of substance because the state had the same burden concerning aggravating factors and defendants were not at risk of any greater punishment. *Id.* Here, Medina does not risk the imposition of any greater punishment and the parties carry the same burdens of proof. Thus, this procedural change did not affect matters of substance and was not ex post facto legislation.

## I. Jury Instructions

¶74 Medina argues that the final jury instructions in the 2009 trial failed to specify that the (F)(6) aggravator was based on relishing and gratuitous violence, which prevented the jury from accurately weighing the severity of the aggravator. Because Medina did not object to the jury instruction at trial, we review for fundamental error. *State v. Moore*, 222 Ariz. 1, 16 ¶ 85, 213 P.3d 150, 165 (2009).

¶75 In the 2009 trial, the court gave the following final jury instructions as to the especially heinous or depraved aggravator:

> The term especially heinous or depraved focuses upon the defendant's state of mind at the time of the offense as reflected by the defendant's words and acts. A murder is especially heinous if it is hatefully or shockingly evil, in other words, grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion or deterioration.

This instruction correctly defined the terms heinous and depraved, *see State v. Murdaugh*, 209 Ariz. 19, 31 ¶ 59, 97 P.3d 844, 856 (2004), and provided the jury with sufficient information to accurately weigh the (F)(6) aggravator.

## J. Prosecutorial Misconduct

¶76 Medina asserts that the State improperly argued in closing that Medina's lack of remorse was an aggravating factor and commented on Medina's right to be free from compelled self-incrimination. Because Medina did not object to the alleged misconduct, we review this claim for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

¶77 During his allocution, Medina stated that he was "deeply sorry and remorseful" for his involvement in the death and that he took "full

responsibility for [his] own participation, actions and role in such act." In closing arguments, the State argued that Medina was not truly remorseful but had said that he felt remorse in his allocution "because he knows it will help to get him off the death penalty." The prosecutor referred to Medina's conversations with interviewing doctors in which he did not take responsibility for all of his actions and denied driving the car that killed the victim. The prosecutor concluded: "If the defendant won't admit to what he did and take responsibility for what he did, how can he truly look at the victim's family or at you and say he is truly remorseful?"

¶78 To determine if prosecutorial misconduct exists, we examine two factors: "(1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that the jurors were in fact influenced by the remarks." *State v. Newell*, 212 Ariz. 389, 402 ¶ 60, 132 P.3d 833, 846 (2006).

¶79 Medina contends that the prosecutor's statements concerning Medina's lack of remorse and the senselessness of the crime argued for aggravating factors neither alleged nor proven. However, the State never argued that lack of remorse should be considered as an aggravator; it used Medina's lack of remorse to rebut Medina's allocution, in which he sought leniency based in part on his remorse. Because Medina's allocution focused on remorse, it was permissible for the State to argue that the evidence showed otherwise.

¶80 The State, by describing the details of the murders, also did not encourage the jury to consider helplessness or senselessness as additional aggravators. *See Nelson*, 229 Ariz. at 190 ¶ 41, 273 P.3d at 642 (holding that in using the terms "helpless" and "senseless," the prosecutor did not argue that the (F)(6) aggravator be considered). Describing the details of a murder, even calling it a senseless crime, without more, does not amount to prosecutorial misconduct.

¶81 Medina also asserts that the prosecutor improperly suggested Medina should be sentenced to death because he chose not to testify. The prosecutor's statements, however, reflect an effort to rebut Medina's allocution, not a comment on the exercise of his Fifth Amendment rights. In closing arguments, the prosecutor first noted that Medina claimed in his allocution to feel remorse and to have taken responsibility for his actions. The prosecutor then argued that while Medina took responsibility for fighting with the victim, he had not taken responsibility

for pulling him into the road or running him over, but instead had blamed his co-defendant. The State argued that Medina's falsely stating that he took full responsibility for his actions showed that his claimed remorse was also false.

¶82 This was permissible rebuttal. In *State v. Cota*, the prosecutor argued that if the defendant were truly remorseful "wouldn't he have told the police how sorry he was?" 229 Ariz. 136, 152 ¶ 83, 272 P.3d 1027, 1043 (2012), *cert. denied*, 133 S. Ct. 107 (2012). We found the comment "permissible" because it contrasted the defendant's "denials of responsibility in the interrogation with his subsequent claim of remorse." *Id.* We reach the same conclusion here. Because Medina argued that his remorse should be considered as mitigation, the State could argue in rebuttal that Medina's failure to take full responsibility for the murder showed that his remorse was not genuine.

### III. INDEPENDENT REVIEW

¶83 Because the murder was committed before August 1, 2002, this Court independently reviews the "findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-755(A). "We review the record de novo and do not defer to the jury's findings or decisions." *State v. Prince*, 226 Ariz. 516, 539 ¶ 93, 250 P.3d 1145, 1168 (2011). "We consider the quality and strength, not simply the number, of aggravating and mitigating factors." *Glassel*, 211 Ariz. at 55 ¶ 93, 116 P.3d at 1215 (quoting *State v. Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998)).

### A. Aggravating Circumstances

¶84 The jury found four aggravating circumstances: Medina was previously convicted of a serious offense, A.R.S. § 13-751(F)(2); the murder was committed in an especially heinous or depraved manner, *id.* § 13-751(F)(6); the murder was committed while on authorized release from prison, *id.* § 13-751(F)(7)(a); and the victim was more than seventy years old, *id.* § 13-751(F)(9).

#### 1. (F)(2) Aggravator

¶85 Medina does not dispute the finding of the (F)(2) aggravator but argues that it should be given less weight because he had been charged with the underlying offenses (aggravated assault and robbery) and

released only six months before committing the murder. We decline to create such a rule.

### 2.    (F)(7) Aggravator

¶86    Medina also admits that sufficient evidence was presented to support the (F)(7) aggravator, that the murders were committed while he was on release from prison, but argues that its similarity to the (F)(2) aggravator implies that these aggravators should be counted only once in aggravation. Because we find that the aggravators serve different public policy rationales, we give weight to each aggravator.

### 3.    (F)(9) Aggravator

¶87    Medina admits there was sufficient evidence to establish the (F)(9) aggravator, but argues that it should be given little weight because he did not know the victim's age. We disagree, given that the statute itself does not require such knowledge. *See Medina*, 193 Ariz. at 512 ¶ 23, 975 P.2d at 102.

### 4.    (F)(6) Aggravator

¶88    Medina contends that the evidence was insufficient to show that the murder was especially heinous or depraved. The jurors were instructed on two factors to support a finding of heinousness and depravity:  the defendant relished the murder and inflicted gratuitous violence. *See State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983).

#### a.    *Relishing*

¶89    In the 2008 trial, Angela Calderon testified that when Medina came to her house shortly after the murder, he was intoxicated and laughing. She stated that he was "laughing and they kept talking about — like they just kept simulating like driving over a speed bump. I asked him what he was laughing at. He said, 'Just watch the news tomorrow and look for tire markings.'" She confirmed that Medina made "varoom, bump, bump" noises and driving motions and told her to watch the news for tire markings or a speed bump.

¶90    Calderon also testified that when Medina called ten minutes later, he "just continued to laugh and telling me to watch the news." The next day, when Medina told her more details about that night he was

"giggling," "but he was more nervous about it." On cross examination, Calderon stated that Medina "never bragged" about the murder when it was on television and that he had expressed some remorse to her, although she felt that "he was scared of being caught."

¶91 To relish a murder, the defendant "must say or do something that indicates he savored the murder." *Greene*, 192 Ariz. at 440 ¶ 34, 967 P.2d at 115. Laughing or bragging about the murder may show that the defendant relished the murder. *See Hausner*, 230 Ariz. at 81 ¶¶ 91–95, 280 P.3d at 625. In *State v. Runningeagle*, we found that the defendant relished the murder when he laughed as he returned to the car after the murder and bragged that "he had been in a 'good fight.'" 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993). Likewise, we concluded in *State v. Bearup* that the defendant relished the murder by "laughing while talking about cutting off a person's finger" and showing amusement when he told another person about the murder. 221 Ariz. 163, 173 ¶ 54, 211 P.3d 684, 694 (2009). In *State v. West*, the Court found the defendant's statements that he had beat up an old man and his bragging about cuts and bruises from beating the man showed relishing. 176 Ariz. 432, 448, 862 P.2d 192, 208 (1993), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1998).

¶92 Here, Medina's laughter and jokes to Calderon show that he relished the murder at or near the time of its commission. Also, Medina repeatedly mimicked speed bumps and told Calderon to watch the news, which shows that he anticipated the publicity that the murder would occasion and looked forward to it. Therefore, we find beyond a reasonable doubt that Medina relished the murder.

b. *Gratuitous Violence*

¶93 Medina argues that the evidence presented in the 2008 trial did not show that he "continued to inflict violence *after he knew or should have known that a fatal action had occurred*." *Bocharski*, 218 Ariz. at 494 ¶ 87, 189 P.3d at 421.

¶94 In 2008, the medical examiner testified that "the distribution of injuries" suggested that the victim was run over more than once. He did not confirm that the victim died after the first pass of the car, but he testified that the victim was alive when he was first hit and that being run over by two sets of tires in a single pass could have caused the heart and

23

lung injuries that led to his death. The examiner testified that the victim died "fairly rapidly," "[p]robably less than a minute," or even "probably seconds" after being run over.

¶95 Calderon testified that Medina told her that he ran over the victim "about three times," "once going forward, once going backwards and then once again coming forward." She also stated that Medina said "that every time he ran over [the victim,] the head would move into a different direction."

¶96 Giles's testimony from the first trial was read to the 2008 and 2009 juries because Giles died before the 2008 trial. He testified that the victim became "red-headed" after the tires went over him. Giles could not see if the tires actually ran over the victim's head, but said the victim seemed to be either unconscious or dead after the first pass of the car.

¶97 We find that Medina knew or should have known that he had inflicted a fatal wound and yet continued to inflict injury upon the victim. The seventy-one year old victim had been beaten up, stomped on, and dragged into the street, then run over by a car containing three men. According to the medical examiner, the victim died less than a minute, perhaps even seconds, after the first pass of the car. After the first pass, the victim was so bloodied that it was visible to a witness across the street. Yet Medina ran over the victim twice more.

¶98 This case is unlike *Bocharski*, in which there was insufficient evidence that the defendant knew or should have known that he had inflicted a fatal wound when he inflicted many rapid knife injuries to the victim. 218 Ariz. at 494 ¶¶ 87–88, 189 P.3d at 421. Nor is it like *State v. Gunches*, in which the defendant shot the victim three times in the chest "in quick succession," followed by a fourth shot to the head. 225 Ariz. 22, 26 ¶ 20, 234 P.3d 590, 594 (2010). We there concluded that because of the victim's body position, the distance between the victim and the defendant, and the darkness of the night, the defendant was likely unable to determine whether the victim had died before firing the fourth shot. *Id.* ¶¶ 18–20. This inference was supported by the defendant's testimony that the victim continued to breathe after falling to the ground, evidence of aspiration around the victim's mouth, and the medical examiner's testimony that the victim's heart continued to beat "for a while after the shooting." *Id.* ¶ 21 (internal quotation marks omitted). Here, there was no evidence or reason to believe that one pass of the car, on top of the

victim's other injuries, was not a fatal action. Medina should have known that running over a man in his seventies who had already received multiple blows was enough to kill him; additional force was unnecessary and gratuitous.

¶99 Because we find that both relishing and gratuitous violence were proven beyond a reasonable doubt, we do not reach Medina's contention that a special verdict is necessary for each *Gretzler* factor.

## B.   Mitigating Circumstances

### 1.   Significant Impairment — A.R.S. § 13-751(G)(1)

¶100 Medina argues that his use of intoxicants and his psychological disorder significantly impaired his capacity to conform his conduct to the requirements of the law. To establish the (G)(1) mitigating factor, a defendant must show by a preponderance of the evidence that the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-751(G)(1).

¶101 Neither party disputes Medina's dependency on inhalants, alcohol, and marijuana at the time of the murder. The trial evidence showed that Medina's capacity to control his conduct or appreciate its wrongfulness was substantially impaired by the various drugs he had taken on that day. Thus, Medina established the (G)(1) mitigating factor. Because we give weight to Medina's drug abuse under § 13-752(G)(1), we give little additional weight to Medina's long-term drug addiction as non-statutory mitigation. *Cf. Moore*, 222 Ariz. at 21 ¶ 121, 213 P.3d at 170 (giving weight to defendant's long-term drug addiction as non-statutory mitigation when the addiction did not satisfy the statutory requirements).

¶102 Medina also argues that his mental illness significantly impaired his capacity to conform his conduct to the requirements of the law. Medina presented evidence concerning two possible psychological disorders: anti-social personality disorder and delusional disorder.

¶103 Medina offered evidence that he suffered from anti-social personality disorder. "Personality or character disorders, however, typically do not satisfy [the (G)(1)] mitigator . . . ." *State v. Tucker*, 215

Ariz. 298, 323 ¶ 118, 160 P.3d 177, 202 (2007).  Medina did not offer any evidence that his anti-social personality disorder substantially impaired his ability to conform his conduct to the requirements of the law or prevented him from appreciating the wrongfulness of his conduct. Therefore, Medina has failed to prove that his personality disorder meets the standard in § 13-751(G)(1).  Instead, we give his personality disorder some weight as non-statutory mitigation.

**¶104**  Medina also contends that his delusional disorder, persecutory type, establishes the (G)(1) factor.  However, Medina did not offer proof that the disorder prevented him from knowing right from wrong or conforming his conduct to the requirements of the law.  Thus, Medina has not proven the (G)(1) mitigating circumstance with respect to his delusional disorder, and we do not afford this disorder substantial weight as non-statutory mitigation.

### 2.    Defendant's Age — A.R.S. § 13-751(G)(5)

**¶105**  A.R.S. § 13-751(G)(5) establishes the defendant's age as a mitigating factor.  Because Medina was eighteen years old at the time of the murder, he has established this statutory mitigator.  "To determine how much weight to assign the defendant's age, we must also consider his level of intelligence, maturity, past experience, and level of participation in the killings."  *State v. Poyson*, 198 Ariz. 70, 80 ¶ 37, 7 P.3d 79, 89 (2000).  "If a defendant has a substantial criminal history or was a major participant in the commission of the murder, the weight his or her age will be given may be discounted."  *Id.* at 81 ¶ 37, 7 P.3d at 90.

**¶106**  Medina was of average or low-average intelligence and had never lived on his own.  He had prior convictions for aggravated robbery and aggravated assault.  Medina was a major participant in the murder:  he pulled the victim from the car, stomped on him repeatedly, dragged him into the street, and then repeatedly drove over him.  We give minimal weight to Medina's age as a mitigating factor.

### 3.    Non-Statutory Mitigation

**¶107**  Medina alleges his gang affiliation and the lack of a plea bargain from the State as mitigation.  We do not find these factors to be mitigating. Moreover, Medina stated on the record that he had rejected a plea offer from the State that would have resulted in a sentence of life without

parole.

**¶108** Medina also argues that he has rehabilitated himself by becoming an artist. Rehabilitation through education and art can be considered as a non-statutory mitigating circumstance. *See State v. Roscoe*, 184 Ariz. 484, 501, 910 P.2d 635, 652 (1996). We do not find that this circumstance merits significant weight here.

**¶109** Medina argues that he poses no future threat. We give this mitigating circumstance minimal weight. *See State v. Garcia*, 224 Ariz. 1, 22 ¶ 108, 226 P.3d 370, 391 (2010).

**¶110** Medina contends that his co-defendant has received a sentence of life in prison and that this disparate sentence should be considered in mitigation. Unexplained disparities in the sentences of accomplices may be a mitigating circumstance, but such disparities have little significance when the murder is especially cruel, heinous, or depraved. *See State v. Ellison*, 213 Ariz. 116, 140 ¶ 105, 140 P.3d 899, 923 (2006). Here, the disparity can be explained. Medina, not his co-defendant, pulled the victim from the car, stomped on him, dragged him into the street, and drove over him multiple times. We do not find that the disparity here is significantly mitigating.

**¶111** Medina additionally alleges family support as a mitigating circumstance. We agree that "close family ties may be mitigating." (*Robert G.*) *Jones*, 197 Ariz. at 313 ¶ 77, 4 P.3d at 368. Medina has established that he has a close relationship with his family. However, we find Medina's family support "only slightly mitigating" because he committed the murder while in his parent's custody. *See id.*

**¶112** Next, Medina argues that his remorse should be given weight in mitigation. Medina expressed remorse to his girlfriend the day after the murder; however, she characterized Medina's regret not as an increased sensitivity to the magnitude of the crime but more as "worr[y] about getting caught."

**¶113** Medina also expressed remorse in his allocution. Yet, the State's expert testified that Medina had not shown regret or remorse during his interview and opined that Medina was unlikely to feel any true remorse. Medina's expert, Dr. Lanyon, also testified that it would "take quite some time" for Medina to feel remorse. Given this record, we give little

mitigating weight to Medina's remorse.

¶114  Medina contends that we can consider mitigation evidence from the 2008 trial that was not introduced at the 2009 trial although we decline to consider evidence not presented to the sentencing jury when conducting an independent review of aggravating circumstances.  *See State v. Nordstrom*, 230 Ariz. 110, 119 ¶ 46, 280 P.3d 1244, 1253 (2012).  Even if we consider the evidence from the 2008 trial, however, we find it is not significantly mitigating.

## C.    Propriety of Death Sentence

¶115  Based on the aggravating and mitigating circumstances present in this case, we find that "the mitigation is not sufficiently substantial to warrant leniency."  A.R.S. § 13-755(B).

## VI.  CONCLUSION

¶116  We affirm Medina's death sentence.[3]

---

[3]    Medina also lists thirty-seven constitutional claims that he states this Court has rejected in other cases; we decline to revisit these claims.