IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

THE STATE OF ARIZONA,
*Appellee,*

*v.*

RICHARD PORTUGAL ORTIZ,
*Appellant.*

No. 2 CA-CR 2014-0330
Filed October 16, 2015

Appeal from the Superior Court in Pima County
No. CR20122655001
The Honorable Javier Chon-Lopez, Judge

**AFFIRMED**

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By David A. Sullivan, Assistant Attorney General, Tucson
*Counsel for Appellee*

Steven R. Sonenberg, Pima County Public Defender
By Michael J. Miller and David J. Euchner,
Assistant Public Defenders, Tucson
*Counsel for Appellant*

## OPINION

Judge Howard authored the opinion of the Court in which Presiding Judge Vásquez and Judge Kelly[1] concurred.

H O W A R D, Judge:

**¶1**      Following a jury trial, appellant Richard Ortiz was convicted of four counts of sexual conduct with a minor and sentenced to enhanced prison terms. On appeal, he argues the trial court erred by allowing unfairly prejudicial expert testimony on the characteristics of child victims of sexual abuse and violated his Confrontation Clause rights by ruling the state did not need to call as witnesses the technicians who handled Ortiz's deoxyribonucleic acid (DNA) sample during the preliminary testing process. He additionally argues the court illegally enhanced his sentences because the jury, and not the court, should have determined whether they had been committed on the same occasion. Because the court did not err in admitting any evidence, and the sentencing error was harmless beyond a reasonable doubt, we affirm Ortiz's convictions and sentences.

### Factual and Procedural Background

**¶2**      We view the evidence in the light most favorable to affirming the jury's verdicts. *State v. Haight-Gyuro*, 218 Ariz. 356, ¶ 2, 186 P.3d 33, 34 (App. 2008). At the start of her freshman year of high school, J.V. joined the wrestling team and Ortiz was her coach. The following summer, in June 2012, J.V. was fifteen years old and she and Ortiz, who was fifty-three, engaged in a series of sexual encounters. The first occurred in mid-June, when J.V. was exercising in the school gym. Ortiz approached her, kissed her, and placed his

---

[1]The Hon. Virginia C. Kelly, a retired judge of this court, is called back to active duty to serve on this case pursuant to orders of this court and our supreme court.

hands inside J.V.'s pants and inserted his fingers into her vagina. Later that month, Ortiz drove J.V. to a park, and they engaged in sexual intercourse.

¶3 On June 30, Ortiz drove J.V. home in his mother's minivan from a martial arts event. At some point, Ortiz parked the minivan and began kissing J.V. The two then moved into the backseat, where they engaged in sexual intercourse and, afterwards, J.V. began masturbating Ortiz. Meanwhile, a Pima County Sheriff's deputy, responding to a suspicious vehicle report, parked in front of Ortiz's vehicle and shined his lights into the minivan. When the deputy approached the minivan, Ortiz was in the driver's seat and J.V. was in the back seat getting dressed. Ortiz's DNA and sperm were found on J.V.'s underwear and J.V.'s DNA was found on Ortiz's penis and underwear.

¶4 Ortiz was charged with seven counts of sexual conduct with a minor, and a jury found him guilty of four of those counts.[2] The trial court determined some of the offenses had not occurred on the same occasion and sentenced him to enhanced, presumptive, concurrent and consecutive prison terms totaling 3.75 years. We have jurisdiction over Ortiz's appeal pursuant to A.R.S. §§ 12-120.21(A)(1) and 13-4033(A)(1).

**Expert Abused Child Testimony**

¶5 Ortiz first argues the trial court improperly allowed the expert testimony of Dr. Wendy Dutton on the general characteristics of child sexual abuse victims. He contends the probative value of several areas of Dutton's testimony was outweighed by the potential for unfair prejudice. We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion, *State v. Salazar-Mercado*, 234 Ariz. 590, ¶ 13, 325 P.3d 996, 1000 (2014), viewing "the evidence in the 'light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial

---

[2]The counts of which Ortiz was acquitted were alleged to have occurred on different dates and at different places from the counts of which he was found guilty.

effect,'" *State v. Harrison*, 195 Ariz. 28, ¶ 21, 985 P.2d 513, 518 (App. 1998), *quoting State v. Castro*, 163 Ariz. 465, 473, 788 P.2d 1216, 1224 (App. 1989).

¶6 After a *Daubert*[3] hearing, the trial court concluded that Dutton was qualified as an expert under Rule 702, Ariz. R. Evid., and that the probative value of her testimony was not outweighed by the potential for unfair prejudice. Dutton testified at trial as a "blind" or "cold" expert, meaning she had no knowledge about the facts of this case and would not offer any opinions specific to it. As relevant here, Dutton testified that children often disclose abuse in a "piecemeal" fashion, disclosing the least embarrassing or shameful details first, and, depending on the reaction they receive, will later reveal more details. And, Dutton testified studies have shown children often "under report" the abusive acts that have occurred.

¶7 Dutton also explained that children typically disclose information either purposefully—taking the initiative to report the abuse to someone else—or are prompted—when someone else asks the child a direct question after, for example, the abuse is somehow discovered. She further stated, based on her "experience and the current research and literature," children "are more likely to be abused by somebody they know." She went on to describe the "grooming" process, which is how the abuser will "acquaint [the child] with physical contact or sexuality."

¶8 Rule 702, which governs the admissibility of expert witness testimony, "does not bar 'cold' experts from offering general, educative testimony to help the trier of fact understand evidence or resolve fact issues." *Salazar–Mercado,* 234 Ariz. 590, ¶ 6, 325 P.3d at 998. "When the facts of the case raise questions of credibility or accuracy that might not be explained by experiences common to jurors—like the reactions of child victims of sexual abuse—expert testimony on the general behavioral characteristics of

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *State v. Perez*, 233 Ariz. 38, ¶ 16, 308 P.3d 1189, 1193 (App. 2013) (Rule 702, Ariz. R. Evid., reflects Arizona's adoption of *Daubert* standard).

such victims should be admitted." *State v. Lujan*, 192 Ariz. 448, ¶ 12, 967 P.2d 123, 127 (1998); *see also State v. Tucker*, 165 Ariz. 340, 346, 798 P.2d 1349, 1355 (App. 1990) ("[A]n expert witness may testify about the general characteristics and behavior of sex offenders and victims if the information imparted is not likely to be within the knowledge of most lay persons" so long as the expert does not "quantify nor express an opinion about the veracity of a particular witness or type of witness.").

**¶9** Even if admissible under Rule 702, expert testimony still must undergo a Rule 403, Ariz. R. Evid., analysis. *Salazar-Mercado*, 234 Ariz. 590, ¶ 20, 325 P.3d at 1001. Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. Ariz. R. Evid. 403. "Unfair prejudice results if the evidence has an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror." *State v. Mott*, 187 Ariz. 536, 545, 931 P.2d 1046, 1055 (1997). "Deciding whether expert testimony will aid the jury and balancing the usefulness of expert testimony against the danger of unfair prejudice are generally fact-bound inquiries uniquely within the competence of the trial court." *State v. Moran*, 151 Ariz. 378, 381, 728 P.2d 248, 251 (1986).

**¶10** Ortiz argues that Dutton is not qualified as an expert under Rule 702(a), which requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." He argues Dutton's testimony is within the common knowledge of a juror, and is therefore not helpful.

**¶11** At oral argument, Ortiz acknowledged our case law finding that "the average juror is [not] familiar with the behavioral characteristics of victims of child molesting," thus making Dutton's testimony proper under Rule 702(a). *State v. Lindsey*, 149 Ariz. 472, 473-74, 720 P.2d 73, 75 (1986); *see also Moran*, 151 Ariz. at 382, 728 P.2d at 251. He argued, however, that in today's society, much of Dutton's testimony is within the common knowledge of jurors. But Ortiz conceded the record in this case does not contain anything that allows this court to revisit the conclusion reached in *Lindsey*. *See Salazar-Mercado*, 234 Ariz. 590, ¶¶ 17, 19, 325 P.3d at 1000-01 (absent

"studies, testimony, or other evidence casting doubt on" continued value of Dutton's testimony on Child Sexual Abuse Accommodation Syndrome, court would not reconsider whether testimony still admissible under Rule 702(a)). Ortiz's argument on Dutton's qualifications under Rule 702(a) accordingly fails.

¶12 The main thrust of Ortiz's argument is that the prejudicial effect of several areas of Dutton's testimony outweighed any probative value. He first argues her testimony that most child abusers know their victims is "not a 'behavioral characteristic'" and was irrelevant because "there was no claim here that [J.V.] was being abused by a stranger." But J.V.'s credibility was a central issue in this case and, as Dutton explained during the *Daubert* hearing, "there are some myths out there which tend to suggest that rape is predominately perpetrated by somebody unknown to the victim." Ortiz did not contest this assertion with any evidence. This testimony therefore was helpful to the jurors in assessing the credibility of the witnesses and determining the facts. *See Lujan*, 192 Ariz. 448, ¶ 12, 967 P.2d at 127.

¶13 Ortiz further argues this testimony was unfairly prejudicial because it "implied that [Ortiz] committed other offenses as well." He does not, however, explain, and we fail to see, how this testimony would have given rise to such an implication. Dutton provided only generalized testimony, stated she did not know any of the underlying facts of this case, and did not opine as to J.V.'s credibility or Ortiz's guilt or innocence. And Ortiz was able to cross-examine Dutton. Thus, "the 'good common sense of jurors [could] discern that which is true from that which is false'" and the trial court did not abuse its discretion in finding the probative value of the testimony was not substantially outweighed by the risk of unfair prejudice. *Moran*, 151 Ariz. at 384, 728 P.2d at 254, *quoting State v. Moran*, 151 Ariz. 373, 377, 728 P.2d 243, 247 (App. 1985).

¶14 Ortiz next argues Dutton's testimony regarding "piecemeal disclosure . . . was not probative of the actual situation" in this case because J.V.'s disclosures were not made to a "neutral supportive forensic interviewer." But Ortiz mischaracterizes Dutton's testimony. She stated "[p]iecemeal disclosure refers to" children disclosing the "least embarrassing or the least shameful"

aspects of the abuse, and then waiting to see how people react before revealing more details. Although she noted that children may be more likely to disclose additional details to a trained interviewer, she did not state that was a requirement.

**¶15** After the deputy found J.V. and Ortiz in the minivan on June 30, J.V. was handcuffed, read the *Miranda*[4] warning, and interrogated by detectives. She initially told detectives that night was the only time any sexual conduct between herself and Ortiz had occurred. One week later, however, she disclosed several other acts of sexual conduct between herself and Ortiz to that same detective.

**¶16** This scenario fits precisely into what Dutton described. Thus, her testimony aided the jury in understanding the reasons for J.V.'s delayed disclosure and in assessing J.V.'s credibility. *See Salazar-Mercado*, 234 Ariz. 590, ¶ 15, 325 P.3d at 1000; *see also Lujan*, 192 Ariz. 448, ¶ 12, 967 P.2d at 127 ("When the facts of the case raise questions of credibility or accuracy that might not be explained by experiences common to jurors—like the reactions of child victims of sexual abuse—expert testimony on the general behavioral characteristics of such victims should be admitted.").

**¶17** Ortiz contends, however, he "was prejudiced by the implication that this was a normal situation." He does not explain that assertion, and we fail to see how he was prejudiced. The jury was informed that J.V. disclosed the incidents after she was handcuffed, read the *Miranda* warning, and interrogated by the detectives. The detective who questioned J.V. testified about his reasons for not using a forensic interviewer. The jury was therefore able to assess the credibility of the witnesses and weigh their testimony accordingly. *See State v. Bustamante*, 229 Ariz. 256, ¶ 5, 274 P.3d 526, 528 (App. 2012).

**¶18** Additionally, the fact that Dutton's description of how children disclose abuse was consistent with the evidence presented at trial does not render her testimony unfairly prejudicial. *See State v. Schurz*, 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993) ("not all harmful

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

evidence is unfairly prejudicial" because "relevant and material [evidence] will generally be adverse to the opponent"). Nor does the testimony "suggest decision on an improper basis, such as emotion, sympathy, or horror." *Mott*, 187 Ariz. at 545, 931 P.2d at 1055. The trial court did not abuse its discretion by admitting it. *See Moran*, 151 Ariz. at 381, 384, 728 P.2d at 251, 254.

¶19 Next, Ortiz argues Dutton's testimony regarding children's tendency to under report was not probative and, instead, "implied other acts [occurred] that were not raised at trial." But Dutton's testimony actually was that children tend to under report what happened during a particular incident, not that other incidents occurred. Therefore, it did not have the implication Ortiz attempts to impose on it.

¶20 Moreover, even if the testimony had the implication Ortiz suggests, Dutton repeatedly stated her testimony was based only on research and literature she had reviewed, as well as her own experience in the field, and she was unaware of any of the facts of this particular case. She specifically stated she did not wish to know the facts in order to prevent her from "purposely or inadvertently tailor[ing her] testimony to fit the facts of the case" and that her testimony was not meant to be an opinion on whether or not the victim had been abused in this case.

¶21 Additionally, the fact that Ortiz was acquitted of three of the seven charged counts indicates that Dutton's testimony did not unfairly prejudice the jury against him. Based on the argument presented here, the trial court did not abuse its discretion in finding any probative value of Dutton's testimony regarding under reporting was not substantially outweighed by the danger of unfair prejudice. *See Moran*, 151 Ariz. at 381, 728 P.2d at 251.

¶22 Ortiz next takes issue with Dutton's testimony regarding grooming because, again, he claims it did not fit the facts of this case and was therefore not probative. Ortiz argues the only evidence presented on this topic was the testimony of another wrestling coach that J.V. and Ortiz appeared "too friendly" and "Dutton did not testify that friendliness was grooming."

¶23 But that contention mischaracterizes that witness's testimony and ignores other evidence presented at trial. The wrestling coach also testified that, at a wrestling tournament, Ortiz and J.V. acted "like boyfriend/girlfriend" and he had received complaints about their behavior from other parents. Additionally, J.V. testified that, in early June, she was riding in the back seat of a car while Ortiz was in the front passenger seat. She "put [her] feet up between [the driver] and Ortiz," when Ortiz began rubbing her feet. Ortiz then removed J.V.'s socks and "put [her] foot in his mouth." He later told J.V. he had a "foot fetish" and "couldn't resist himself."

¶24 Shortly thereafter, Ortiz began sending J.V. "flirtatious" text messages. It was soon after this the incident in the school gym took place. J.V.'s brother, classmates and another teacher testified that Ortiz showed more attention to J.V. than other students and the two often spent time alone together. Dutton's testimony regarding grooming was therefore relevant to help the jury understand the general behavior of child abuse perpetrators and their victims. *See Salazar-Mercado*, 234 Ariz. 590, ¶ 15, 325 P.3d at 1000.

¶25 Ortiz also contends Dutton's testimony that, in the grooming process, "perpetrators will engage in physical contact that children enjoy, for example, wrestling games, tickling games, snuggling, [and] lap sitting," unfairly implied that "female wrestling was rife with possibilities for sexual abuse." When viewed in context, Dutton's description of "wrestling games" was clearly not a reference to the regulated sport of wrestling in high schools and, as Dutton made clear, her testimony was not a comment on any of the particular facts in this case. The trial court did not abuse its discretion in allowing the testimony. *See Moran*, 151 Ariz. at 381, 728 P.2d at 251.

¶26 Ortiz lastly takes issue with Dutton's testimony as to the manner of a child's disclosure. He contends that whether the "disclosure may be prompted, spontaneous, or discovered" has no probative value and instead implied that "this was a normal situation." But he admits the state believed J.V.'s disclosure followed accidental discovery, which did fit the facts here. And, as we noted above, that the disclosure occurred after J.V. was

handcuffed and interrogated does not demonstrate Ortiz was prejudiced. The jury was told of the circumstances under which J.V. had disclosed the incidents and could weigh the evidence accordingly. *See Bustamante*, 229 Ariz. 256, ¶ 5, 274 P.3d at 528; *see also Moran*, 151 Ariz. at 384, 728 P.2d at 254. The trial court did not abuse its discretion. *See Moran*, 151 Ariz. at 381, 728 P.2d at 251.

## Confrontation Clause

**¶27** Ortiz next argues the trial court violated his right under the Confrontation Clause of the Constitution by admitting the testimony of forensic analyst Emily Jeskie. He complains that her analysis of the DNA evidence relied on preparation and testing of samples conducted by technicians who did not testify at trial and were not subject to cross-examination. "[W]e review de novo challenges to admissibility based on the Confrontation Clause." *State v. Bennett*, 216 Ariz. 15, ¶ 4, 162 P.3d 654, 656 (App. 2007).

**¶28** At trial, the state introduced DNA evidence collected from Ortiz's penis and underwear, and J.V.'s underwear through the testimony of Jeskie, a lead forensic DNA analyst with Sorenson Forensics, and her written report. Jeskie testified about the contents of her report and her opinion that J.V. was a contributor to the DNA found on Ortiz's penis and underwear, and that a DNA profile of sperm collected from J.V.'s underwear matched Ortiz's DNA profile. The written report stated that it was a case report generated as part of the investigation of Ortiz for the offense of sexual conduct with a minor.

**¶29** Jeskie testified to the steps by which technicians at Sorenson Forensics process physical evidence to derive and compare DNA profiles. The steps include receipt of the evidence, assignment of a unique identifier to each piece of evidence, preparation of testing samples, extraction of DNA from cells on the prepared samples, duplication of the extracted DNA, processing the DNA through a machine referred to as a "genetic analyzer," entry of data received from the genetic analyzer into a software program, and the review and comparison of the data entered into the program. The process requires participation by a number of different technicians, each of whom is "trained in the standard operating procedures of

the lab," "ha[s] . . . been tested and made sure [each] qualif[ies] and can . . . perform" in compliance with those procedures, and "deemed competent." Through the process, a chain of custody is recorded and each technician takes notes on the tasks performed. But the technicians do not reach any conclusions regarding the evidence or prepare a report.

¶30 Jeskie then reviewed the data from the genetic analyzer that had been entered into the software program, compared the DNA profiles generated from each piece of physical evidence to a sample from Ortiz, formulated her opinion, and wrote a report. She did not conduct and was not present for any of the other steps. She did, however, review all of the work conducted by others in generating the DNA profiles to ensure that proper procedures had been followed and found that no problems with the chain of custody, such as tampering, appeared to have occurred. And she was familiar with and had performed each of the other steps in the process. She also confirmed that quality assurance protocols had been followed for each of the samples processed in this case and that the protocols demonstrated the tests run on the samples worked properly and no contamination occurred.

¶31 "The Sixth Amendment . . . prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, ___ U.S. ___, ___, 135 S. Ct. 2173, 2179 (2015), *quoting Crawford v. Washington*, 541 U.S. 36, 54 (2004). "Testimonial evidence is '*ex parte* in-court testimony or its functional equivalent . . . such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.'" *State v. Medina*, 232 Ariz. 391, ¶ 54, 306 P.3d 48, 62 (2013), *quoting Crawford*, 541 U.S. at 51. A forensic report "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming v. New Mexico*, ___ U.S. ___, ___, 131 S. Ct. 2705, 2717 (2011), *quoting Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009).

¶32 The parties agree that Ortiz's claim here is "exactly the same" as that addressed by our supreme court in *State v. Gomez*, 226

Ariz. 165, 244 P.3d 1163 (2010). In *Gomez*, the state introduced DNA evidence derived by nearly the same "'assembly line'" process used by Sorenson Forensics through the testimony of a senior forensic analyst and supervisor. 226 Ariz. 165, ¶¶ 3-4, 244 P.3d at 1164. Although that analyst "had not witnessed all of the steps in the process," she "had checked the technicians' records for any deviations from the laboratory's protocols, . . . performed the initial evidence screening and DNA extraction on most of the items," and "personally performed the final step in the process, interpretation and comparison" of "the DNA profiles generated in the laboratory." *Id.* ¶¶ 3-4 & n.1.

¶33 The court noted the final step that the testifying analyst had completed "was the only step involving human analysis." *Id.* ¶ 4. And similar to this case, the analyst in *Gomez* testified "about the laboratory's operating procedures, standards, and safeguards," the chain of custody, and "that several profiles derived from the evidence at the crime scene 'matched' the profile obtained from Gomez's blood sample." *Id.* ¶¶ 4-5.

¶34 Gomez argued that "the analyst's testimony about the DNA profiles was hearsay because she was not involved in generating those profiles." *Id.* ¶ 11. The court, relying on *Melendez-Diaz*, began by noting that "the Confrontation Clause does not require that every person in the chain of custody be available for cross-examination." *Id.* ¶ 14. Rather, "[t]he Sixth Amendment requires only that those who do testify about the chain of custody be available for cross-examination." *Id.*

¶35 The court ultimately held that, even assuming the DNA profiles were hearsay and that the analyst's testimony was the functional equivalent of entering the DNA profiles into evidence, the testimony did not violate the Confrontation Clause because "[t]he analyst was able to review that work, testify from her own knowledge as to the procedures used, and answer questions during cross-examination about the accuracy of the results." *Id.* ¶¶ 12-13, 21. The technicians, on the other hand, "at most could have testified about the mechanical steps they took to process the DNA samples." *Id.*

¶36      The court then concluded the analyst's expert testimony that the DNA profiles "matched" similarly did not violate the Confrontation Clause because the analyst did not "'act as a conduit for another non-testifying expert's opinion'" and instead "formed her own opinions, based on a type of data normally relied upon by experts in her field." *Id.* ¶¶ 5, 22-23, *quoting State v. Snelling*, 225 Ariz. 182, ¶ 19, 236 P.3d 409, 414 (2010). Additionally, the analyst "was subject to cross-examination about her independent conclusion that several of the DNA profiles came from the same person." *Id.* ¶ 24.

¶37      Ortiz argues that *Gomez* is no longer valid law in light of the United States Supreme Court's recent decision in *Bullcoming*. He contends *Bullcoming* stands for the proposition that a "defendant has the right to confront the technicians who prepare and load the sample and the ability to question the analyst on the read-out of the [genetic analyzer] and the standard protocols." He further contends that *Bullcoming* "rejected *Gomez*'s holding that 'the mechanical steps [the technicians] took to process the DNA samples' [were] not subject to the [C]onfrontation [C]lause, but could be testified to by the analyst." *See Gomez*, 226 Ariz. 165, ¶ 21, 244 P.3d at 1167.

¶38      But *Bullcoming* does not stand for these propositions. As the Court stated, *Bullcoming* addressed the question of "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." ___ U.S. at ___, 131 S. Ct. at 2710.

¶39      In that case, analyst Curtis Caylor's report certified that "he received Bullcoming's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number 'correspond[ed],' and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol." *Id.* at ___, 131 S. Ct. at 2714. Additionally, Caylor certified that "no 'circumstance or condition . . . affect[ed] the integrity of the sample or . . . the validity of the analysis.'" *Id.* At the time of trial Caylor had been placed on unpaid leave and, in his

13

place, the state relied upon the testimony of Gerasimos Razatos, an analyst who worked for the same laboratory as Caylor, but "had neither observed nor reviewed Caylor's analysis." *Id.* at ___, 131 S. Ct. at 2711-12. The state never asserted Razatos had developed an independent opinion on the results of the forensic testing. *Id.* at ___, 131 S. Ct. at 2716.

¶40 The Court concluded Razatos's testimony violated Bullcoming's Confrontation Clause right. *Id.* at ___, 131 S. Ct. at 2714-15. In doing so, the Court found Razatos only provided "surrogate testimony," which "could not convey what Caylor knew or observed about the events his certification concerned . . . [or] expose any lapses or lies on the certifying analyst's part." *Id.* at ___, 131 S. Ct. at 2715. And Bullcoming could not cross-examine Caylor about the reason he had been placed on unpaid leave or any other facts that may have raised doubts about the certifying analyst's credibility. *Id.* at ___, 131 S. Ct. at 2715-16. "In short, when the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront." *Id.* at ___, 131 S. Ct. at 2716.

¶41 Despite Ortiz's insistence, *Bullcoming* did not create a new rule requiring the state to call every person in the chain of custody or every person who had participated in testing to testify at trial. The court instead was analyzing its precedent that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial,' and therefore within the compass of the Confrontation Clause" under a specific factual scenario. *Id.* at __, 131 S. Ct. at 2714; *see also Williams v. Illinois*, ___ U.S. ___, ___, 132 S. Ct. at 2221, 2233 (2012) (*Bullcoming* "held that [a] scientific report could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the report was subject to confrontation.").

¶42 This interpretation was reiterated by Justice Sotomayor in her concurring opinion, which was meant, in part, "to emphasize the limited reach of the Court's opinion." *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2719 (Sotomayor, J., concurring). Justice Sotomayor pointed out that Razatos "played no role in producing the . . . report[,] . . . did not observe any portion of [Caylor's] conduct of the testing" and did not offer an "independent, expert opinion about

Bullcoming's blood alcohol concentration." *Id.* at ___, 131 S. Ct. at 2722. And she also confirmed, as the court previously had stated in *Melendez-Diaz*, that the Confrontation Clause does not require "'that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.'" *Id.* at ___, 131 S. Ct. at 2721 n.2 (Sotomayor, J., concurring), *quoting Melendez-Diaz*, 557 U.S. at ___, 129 S. Ct. at 2532 n.1.

¶43        Under *Bullcoming*, the state is not required to present the live testimony of every technician who assisted in generating the DNA profiles. Therefore, we reject Ortiz's argument that, after *Bullcoming*, *Gomez* is no longer good law. *See State v. Michaels*, 95 A.3d 648, 662 (N.J. 2014) (*Bullcoming* does not stand "for the proposition that forensic reports require, for their admission, the testimony of all analysts involved in the handling and testing of a sample used in any forensic analysis.").

¶44        Ortiz also appears to rely on some portions of the Supreme Court's decision in *Williams*, while distinguishing its result. There, the Court affirmed Williams's conviction for sexual assault, even though the testifying analyst drew independent conclusions about DNA profiles she had received from an outside laboratory, but lacked personal knowledge of the procedures and testing conducted to generate one of the DNA profiles on which she opined. *See Williams*, ___ U.S. at ___, 132 S. Ct. at 2227, 2236. In particular, the case centered around the expert's testimony that the DNA profile was "produced from semen found on the victim's vaginal swab" despite the fact that she did not have any actual knowledge of whether that was true. *Id.* at ___, 132 S. Ct. at 2227, 2235-36, 2267, 2270 (Kagan, J., dissenting).

¶45        The plurality opinion first determined the DNA profiles were not hearsay because "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Id.* at ___, 132 S. Ct. at 2228. Rather, the testifying analyst in that case "referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's

DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from [the defendant's] blood." *Id.* at ___, 132 S. Ct. at 2240. Justice Thomas and the four dissenting justices, however, found the statements clearly were offered for the truth of the matter asserted, and the plurality's analysis on that point had "no merit." *Id.* at ___, 132 S. Ct. at 2256 (Thomas, J., concurring), 2268 (Kagan, J., dissenting).

¶46 Applying the plurality's hearsay analysis here shows that Jeskie did not relate testimonial hearsay. When discussing the DNA profiles, Jeskie was explaining only the "assumptions on which" her opinion rested. *Id.* at ___, 132 S. Ct. at 2228; *see also State v. Joseph*, 230 Ariz. 296, ¶ 8, 283 P.3d 27, 29 (2012) ("a testifying medical examiner may offer an opinion based on an autopsy performed by a non-testifying expert without violating the Confrontation Clause" where report not admitted into evidence and testifying expert reaches independent conclusions). Consequently, Jeskie's testimony did not violate the Confrontation Clause.

¶47 The plurality however, identified a "second, independent basis" for its conclusion that Williams's Confrontation Clause right was not violated. *Williams*, ___ U.S. at ___, 132 S. Ct. at 2228. It found the profiles, even if offered for the truth of the matter asserted, were not testimonial. *Id.* at ___, 132 S. Ct. at 2242. It concluded that, post-*Crawford*, Confrontation Clause violations occur when the statements at issue are "formalized" and have "the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Id.* at ___, 132 S. Ct. at 2242; *see also State v. Medina*, 232 Ariz. 391, ¶ 58, 306 P.3d 48, 63 (2013); *Young v. United States*, 63 A.3d 1033, 1040-41 (D.C. 2013).

¶48 In *Williams*, the DNA profiles were created before a suspect was identified and thus the "primary purpose" was "to catch a dangerous rapist who was still at large." *Williams*, ___ U.S. at ___, 132 S. Ct. at 2243. The authors of the reports could not have known the results would inculpate the defendant. *Id.* at ___, 132 S. Ct. at 2243-44. After concluding the profiles failed the "primary purpose" test, the Court did not discuss whether the profiles would be considered "formalized statements." *Id.* at ___, 132 S. Ct. at 2244.

**¶49** The DNA profiles in this case, unlike those in *Williams*, were created for the "primary purpose" of gathering evidence against Ortiz. *See id.* at ___, 132 S. Ct. at 2242. However, until Jeskie issued her opinion that the samples matched, they did not inculpate Ortiz. Jeskie was thus the only "'witness[] against'" Ortiz because, "[a]bsent [her] analysis, we are left with an abstract graph or set of numbers that has no bearing on the trial." *See State v. Lui*, 315 P.3d 493, ¶ 67 (Wash. 2014), *quoting* U.S. Const. amend. VI.

**¶50** Further, the DNA profiles were not "formalized statements, such as affidavits, depositions, prior testimony, or confessions." *Id.* at ___, 132 S. Ct. at 2242. The report in this case, like that in *Williams*, "lack[ed] the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact," did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained . . . [a]nd, . . . produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." *Id.* at ___, 132 S. Ct. at 2260 (Thomas, J., concurring). Consequently, regardless of whether the profiles in this case meet the "primary purpose" requirement, they do not meet the second formality requirement identified by the plurality and therefore are not testimonial and not within the scope of the Confrontation Clause.

**¶51** In his concurrence, Justice Thomas found the profiles were hearsay but not testimonial. *Id.* at ___, 132 S. Ct. at 2259. In doing so, he rejected the plurality's "primary purpose" test and instead relied solely on the plurality's second identified criteria: the statements must contain some "'indicia of solemnity.'" *Id.* at ___, 132 S. Ct. at 2259-60, 2262, *quoting Davis v. Washington*, 547 U.S. 813, 836-37 (2006) (Thomas, J., concurring in part and dissenting in part). Accordingly, as discussed above, the DNA profiles here are not testimonial because they lacked the required "solemnity" under Justice Thomas's test.

**¶52** *Williams* is a plurality decision and has limited if any precedential value. *See State v. Medina*, 232 Ariz. 391, ¶ 60, 306 P.3d 48, 63 (2013) ("when no 'single standard . . . legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land'"), *quoting United States v. Alcan Aluminum Corp.*, 315

F.3d 179, 189 (2d Cir. 2003); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 66 (1996) (When "a majority of the Court expressly disagree[s] with the rationale of the plurality," a case is "of questionable precedential value."). But its result is antithetical to Ortiz's claim—five of the nine justices ultimately concluded no Confrontation Clause violation had occurred when the analyst relied on DNA profiles generated by a third-party because the challenged statement was not testimonial. *Id.* at ___, 132 S. Ct. at 2244, 2248 (Breyer, J., concurring), 2255 (Thomas, J., concurring). Under either of the tests proposed by the plurality opinion, or Justice Thomas's solemnity test, *Williams* supports the conclusion that no Confrontation Clause violation occurred here.

¶53 Ortiz further contends that courts in other states have determined that *Melendez-Diaz* and *Bullcoming* stand for the proposition "that testimony about earlier steps in the analysis [are] important to determin[e] the truth of the matter and therefore [are] covered by the" Confrontation Clause. *See Martin v. State*, 60 A.3d 1100 (Del. 2013); *Young*, 63 A.3d 1033; *State v. Navarette*, 294 P.3d 435 (N.M. 2013).

¶54 *Martin* and *Navarette* do not support Ortiz's position because they involved an expert's recitation of observations, interpretations, and conclusion of a non-testifying witness. *See Martin*, 60 A.3d at 1101, 1107-08; *see also Navarette*, 294 P.3d 435, ¶¶ 1, 5, 16-17, 21. Unlike *Martin* and *Navarette*, Jeskie authored the certified report to which she testified and exercised her own independent judgment to reach the conclusion in that report. She did not base her conclusions on, or testify to, a different, non-admitted report prepared by a non-testifying analyst. These cases are therefore inapposite to our analysis here.

¶55 Nor do we find the reasoning of *Young* persuasive. The court in *Young*, based on facts similar to those in this case, found the defendant's Confrontation Clause rights were violated where the testifying analyst who certified the report that Young's DNA matched DNA found on the victim based her conclusion on DNA profiles created by other analysts. 63 A.3d at 1048. The court determined that "without evidence that [the certifying analyst] performed or observed the generation of the DNA profiles . . .

18

herself, her supervisory role and independent evaluation of her subordinates' work product are not enough to satisfy the Confrontation Clause." *Id.*

¶56 We decline to adopt *Young*'s analysis because it extends the reach of the Confrontation Clause further than the Supreme Court has chosen to do in any of its cases. And, "we are not bound by decisions from other states." *State v. Solis*, 236 Ariz. 242, ¶ 14, 338 P.3d 982, 987 (App. 2014). *Young* also would extend the Confrontation Clause further than *Gomez*, which is binding precedent from our state. *See State v. McPherson*, 228 Ariz. 557, ¶ 13, 269 P.3d 1181, 1186 (court of appeals bound by decisions of supreme court). Accordingly, we do not follow *Young*.

¶57 Furthermore, our conclusion is consistent with that reached by many other states confronted with this issue since *Melendenz-Diaz* and *Bullcoming*. The courts in those cases also have found that the state's failure to call a technician from the preliminary steps of preparing a DNA or blood sample does not violate the Confrontation Clause. *See, e.g.*, *Milligan v. State*, 116 A.3d 1232, 1239-40 (Del. 2015) (Confrontation Clause did not require state to call each individual who possessed defendant's blood sample during testing process); *Speers v. State*, 999 N.E.2d 850, 852-53 (Ind. 2013) (Confrontation Clause does not require technician who transferred blood sample for testing from piece of glass to swab); *Michaels*, 95 A.3d at 670-73 (state need not call "all fourteen analysts" involved in testing defendant's blood sample despite fact that testifying analyst did not conduct any preliminary testing or directly observe technicians); *Commonwealth v. Yohe*, 79 A.3d 520, 540-42 (Pa. 2013) (Confrontation Clause required only testimony of toxicologist that reached conclusion on defendant's blood-alcohol level based on raw data generated by other analysts he supervised; collecting similar cases); *State v. Lui*, 315 P.3d 493, ¶¶ 12, 45, 61, 74 (no Confrontation Clause violation where testifying DNA analyst's conclusions based on test results she "did not personally participate in or observe").

¶58 In sum, recent Supreme Court cases do not invalidate *Gomez*, and, consequently, we apply its holding here. Like the testifying analyst in *Gomez*, Jeskie reviewed the work that created

19

the DNA profiles for deviations from laboratory protocols and any quality issues and testified based on her personal knowledge as to the testing conducted by the technicians. *See* 226 Ariz. 165, ¶¶ 4, 21, 244 P.3d at 1164, 1167. Ortiz was able to cross-examine her on the procedures and testing, by asking, for example, whether contamination of the samples could occur despite the quality assurance procedures. Further, she performed the final analysis in which she interpreted the data received and compared the samples. She also formed the opinion that the samples matched Ortiz's DNA.

¶59 The DNA profiles had no evidentiary value until they were compared and matched by Jeskie. Therefore, the other technicians' work and notes were not testimonial. *See Williams*, ___ U.S. at ___, 132 S. Ct. at 2228; *see also Gomez*, 226 Ariz. 165, ¶ 21, 244 P.3d at 1167. Consequently, Jeskie did not act as a "conduit" for another expert's opinion, but instead "formed her own opinions, based on a type of data normally relied upon by experts in her field." *Gomez*, 226 Ariz. 165, ¶¶ 22-23, 244 P.3d at 1167-68. Because the state sought to introduce Jeskie's report, "[she] became a witness [Ortiz] had the right to confront." *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2716. We thus conclude that Jeskie's testimony relying on the DNA profiles created by other technicians in the same laboratory did not violate the Confrontation Clause.

### Sentence Enhancement Under A.R.S. § 13-703

¶60 Ortiz additionally argues that the trial court improperly enhanced his sentence pursuant to A.R.S. § 13-703 because the jury, rather than the court, should have decided whether the offenses had been committed on separate occasions but consolidated for trial. This presents a mixed question of fact and law, which we review de novo. *See State v. Derello*, 199 Ariz. 435, ¶ 8, 18 P.3d 1234, 1237 (App. 2001).

¶61 Before trial, the state filed an allegation, for sentence-enhancement purposes, that Ortiz's offenses had not been committed on the same occasion but were consolidated for trial. *See*

A.R.S. § 13-703(A).[5] During trial, Ortiz requested that the jury determine whether his offenses were committed on the same or separate occasions. The trial court denied that request and, after the jury returned its verdicts, held a separate hearing on this issue. Based on the evidence presented at trial, the court found counts one and five were not committed on the same occasion as each other or counts six and seven.

**¶62** "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, ___ U.S. ___, ___, 133 S. Ct. 2151, 2155 (2013); *see also Apprendi v. New Jersey*, 530 U.S. 466, 483, n.10 (2000). As relevant here, a person convicted of three or more "felony offenses that were not committed on the same occasion but that either are consolidated for trial purposes or are not historical prior felony convictions" is sentenced as a category two, repetitive offender, and therefore, subject to a higher sentencing range than a category one or first-time offender. § 13–703(A); *see also* A.R.S. § 13-702.

**¶63** "Accordingly, the determination whether [Ortiz's] offenses had been committed on the same occasion pursuant to [§ 13–703(A)] was required to have been submitted to the jury, inherent in the jury's verdicts, or otherwise excepted from *Alleyne* and *Apprendi*." *State v. Flores*, 236 Ariz. 33, ¶ 5, 335 P.3d 555, 557 (App. 2014); *see also Alleyne,* ___ U.S. at ___, 133 S. Ct. at 2155 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."), *quoting Apprendi*, 530 U.S. at 490; *Blakely v. Washington*, 524 U.S. 296, 303 (2004) (defendant entitled to separate jury finding if fact not already reflected in verdict or admitted by defendant).

---

[5]Ortiz was sentenced pursuant to A.R.S. § 13-703(B)(1), which has since been renumbered as § 13-703(A). 2015 Ariz. Sess. Laws, ch. 51, § 1. We refer to the current version of the sentencing statute. *See* 2012 Ariz. Sess. Laws, ch. 190, § 2.

¶64 To determine whether offenses were committed on the same occasion, the trier of fact must look at five factors: "1) time, 2) place, 3) number of victims, 4) whether the crimes were continuous and uninterrupted, and 5) whether they were directed to the accomplishment of a single criminal objective." *State v. Kelly*, 190 Ariz. 532, ¶ 6, 950 P.2d 1153, 1155 (1997); *see also Flores*, 236 Ariz. 33, n.2, 335 P.3d at 557, n.2 (noting *Kelly* factors are exclusive). Whether a *Kelly* factor is "inherent in the jury's verdict" requires an examination of the elements of the offense and the indictment. *See Flores*, 236 Ariz. 33, ¶¶ 7-8, 335 P.3d at 557; *see also Blakely*, 542 U.S. at 303-04 (court may not enhance sentence if "additional findings" outside of verdicts required); *cf. State v. Larin*, 233 Ariz. 202, ¶ 38, 310 P.3d 990, 1000-01 (App. 2013) (courts look to statutes defining offense, the indictment, and "whether 'an element of the offense charged contains an allegation and requires proof' of dangerousness" when determining if dangerousness inherent in offense), *quoting State v. Parker*, 128 Ariz. 97, 98, 624 P.2d 294, 296 (1981).

¶65 Ortiz argues "[t]he jury was not asked to determine any of these factors, [as] they were not inherent in the verdict," are not elements of the offenses, and, most importantly, the jury was explicitly told it did not need to determine the date on which the offenses were committed. Ortiz was convicted of four counts of sexual conduct with a minor, which required the state to prove he "intentionally or knowingly" engaged in the "penetration into the . . . vulva . . . by any part of the body . . . or masturbatory contact with the penis" with a person "under eighteen years of age." A.R.S. § 13-1405; A.R.S. § 13-1401. Count one alleged that Ortiz "digitally penetrat[ed] J.V.'s] vulva . . . [o]n or about the 15th of June, 2012." Count five alleged that Ortiz "penetrat[ed] J.V.'s] vulva with his penis . . . [o]n or about the 25th day of June, 2012." Counts six and seven alleged that Ortiz engaged in "masturbatory contact with [J.V.'s] hand" and "penetrat[ed] J.V.'s] vulva with his penis . . . [o]n or about the 30th of June, 2012."

¶66 The state requested an instruction that the evidence simply had to show that the events occurred "on or about" the dates charged. It argued J.V. "was very clear it happened between June

6th or 7th to June 30." Ortiz objected and the trial court overruled the objection. The jury was instructed that it was "not necessary that the proof establish with certainty the exact dates of the alleged offenses. It is sufficient if the evidence shows beyond a reasonable doubt that the offenses were committed on a date reasonably near the dates alleged."

¶67 The state, citing *State v. Roylston*, 135 Ariz. 271, 660 P.2d 872 (1983), relies on an evaluation of the evidence adduced at trial to show that each *Kelly* factor was inherent in the verdict. Prior to *Apprendi*, Arizona trial courts were authorized to make factual findings that could result in the enhancement of a defendant's sentence, including whether the offenses were committed on the same occasion but consolidated for trial. *See, e.g.*, *Roylston*, 135 Ariz. at 272, 660 P.2d at 873; *State v. Sands*, 145 Ariz. 269, 276-77, 700 P.2d 1369, 1376-77 (App. 1985). As discussed in *Flores*, however, *Apprendi* now dictates that the jury, not the court, must determine whether the offenses were committed on the same occasion pursuant to § 13-703(A), unless such a finding was inherent in the verdicts. *Flores*, 236 Ariz. 33, ¶¶ 4-5, 335 P.3d at 557; *see also Ring v. Arizona*, 536 U.S. 584, 602 (2002) ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.").

¶68 In *Flores*, we noted that our review of the indictment was consistent with the approach taken by federal courts interpreting the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), a statute similar to § 13-703. 236 Ariz. 33, n.7, 335 P.3d at 560, n.7. We stated: "Federal trial courts may evaluate [whether prior offenses were committed on different occasions] by examining, inter alia, the charging documents, jury instructions, and verdicts." *Id.*; *see also Shepard v. United States*, 544 U.S. 13, 16 (2005) (for sentence enhancement under 18 U.S.C. § 924, court must limit examination to "statutory definition [of crime], charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented").

¶69 This limitation also is consistent with our approach to analyzing whether, for sentence-enhancement purposes, an out-of-

state conviction qualifies as an historical prior conviction, *State v. Crawford*, 214 Ariz. 129, ¶¶ 7-9, 149 P.3d 753, 755-56 (2007);[6] A.R.S. § 13-703(M), and whether dangerousness is inherent in a jury verdict, *Larin*, 233 Ariz. 202, ¶ 42, 310 P.3d at 1001; A.R.S. § 13-704. We therefore conclude that when reviewing whether a determination that offenses were not committed on the same occasion was inherent in the verdict, we will review only the indictment, jury verdict forms, and elements of the offense, or "some comparable judicial record of this information." *See Shepard*, 544 U.S. at 26.

¶70 At oral argument, the state conceded that, based on the wording of the indictment along with the instruction that the jury need not determine the date on which the offenses were committed, the *Kelly* factors were not inherent in the jury's verdicts. *Cf. Flores*, 236 Ariz. 33, ¶¶ 7-8, 335 P.3d at 557 (three *Kelly* factors inherent in verdict where verdict forms stated jury found Flores guilty of offenses "'as alleged'" in indictment, which listed specific dates, different property taken, and different victims). Because the verdicts did not require a determination of the facts necessary for the trial court to consider each of the *Kelly* factors, the court erred by sentencing Ortiz to enhanced prison terms pursuant to § 13-703(A). *See Flores*, 236 Ariz. 33, ¶ 5, 335 P.3d at 557.

¶71 A sentence imposed in violation of *Apprendi*, however, can be reviewed for harmless error. *State v. Miranda-Cabrera*, 209 Ariz. 220, ¶ 30, 99 P.3d 35, 42 (App. 2004). Error may be harmless if the state can show no reasonable jury would have failed to find the facts necessary to enhance the defendant's sentence. *Id.*; *State v. Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d 601, 607 (2005); *see State v. Ketchner*, 236 Ariz. 262, ¶¶ 20-26, 339 P.3d 645, 648-50 (2014) (conducting harmless error review despite state's failure to argue error was harmless in brief). Although the state failed to explicitly argue the error was harmless beyond a reasonable doubt, in its erroneous reliance on *Roylston*, the state did, in fact, discuss the

---

[6]The discussion in *Crawford* refers to former A.R.S. § 13-604(N), which has since been renumbered to § 13-703(M). 2007 Ariz. Sess. Laws, ch. 287, § 1; 2008 Ariz. Sess. Laws, ch. 301, §§ 15, 16, 28.

evidence adduced at trial and analyze whether that evidence supported the trial court's finding that Ortiz's offenses were not committed on the same occasion. The state thus, in essence, conducted a harmless error analysis. *See Miranda-Cabrera*, 209 Ariz. 220, ¶ 30, 99 P.3d at 42 (*Apprendi* sentencing error harmless in light of evidence adduced at trial); *see also State v. Lizardi*, 234 Ariz. 501, ¶ 19, 323 P.3d 1152, 1157 (App. 2014) ("We consider the error 'in light of all of the evidence.'"), *quoting State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). Furthermore, Ortiz had the opportunity at oral argument before this court to contest the state's assertion of harmless error. Thus, a review of the evidence in this case must show that no reasonable jury would have failed to find, in light of the *Kelly* factors, that the offenses "were not committed on the same occasion." A.R.S. § 13-703(A).

**¶72** Count one alleged that Ortiz "digitally penetrat[ed J.V.'s] vulva . . . [o]n or about the 15th of June, 2012." As to this count, J.V. testified at trial that within a week of returning from a wrestling trip to New Mexico on June 6 or 7, Ortiz took her into a weight room while she working out at her high school, kissed her, and inserted his fingers into her vagina. Another wrestler also testified he saw J.V. and Ortiz leave the weight room together and return approximately thirty minutes later.

**¶73** Count five alleged that Ortiz "penetrat[ed J.V.'s] vulva with his penis . . . [o]n or about the 25th day of June, 2012." In relation to this count, J.V. testified that, on June 25, Ortiz picked her up from her house, drove her to a park, and the two engaged in sexual intercourse on a set of bleachers in a park.

**¶74** Counts six and seven alleged that Ortiz engaged in "masturbatory contact with [J.V.'s] hand" and "penetrat[ed J.V.'s] vulva with his penis . . . [o]n or about the 30th of June, 2012." At trial, both J.V. and the deputy testified that the minivan incident occurred the night of June 30 while parked on the "dead-end side of [a] road."

**¶75** The evidence thus shows the weight room incident, the bleachers incident, and the minivan incident all occurred on different dates and at different locations. Although J.V. was not sure

of the exact date of the weight room incident, her testimony established that it was in the first half of June 2012 and before the other incidents. She also was sure of the location, which was supported by another witness. The dates and locations of the incidents on June 25 and June 30 were established with specificity by J.V. and, with respect to the latter, a sheriff's deputy. Neither Ortiz nor the state has cited any cases where offenses committed on separate dates were found to have occurred on the same occasion. *See Flores*, 236 Ariz. 33, ¶ 9, 335 P.3d at 558 ("[W]e have found no Arizona case concluding that offenses were committed on the same occasion when the crimes were committed on different days, involved different property, or had unrelated victims."). And, because the offenses clearly occurred on separate dates, the offenses could not have been "continuous and uninterrupted." *Flores*, 236 Ariz. 33, ¶ 10, 335 P.3d at 559.

¶76 Ortiz nevertheless argues "there was clearly . . . a single objective implied by the allegations . . . [which] support[s] the finding of one occasion." In *State v. Perkins*, our supreme court found that a string of robberies, which occurred on the same day and in the same location, did not occur on the same occasion despite the defendant's assertion they were committed with "a common scheme . . . to rob whomever they could" because "the acts used to establish each robbery incident were distinct[,] . . . the accomplices apparently did not form the intent to proceed to a new robbery until after completing the prior robbery[, and t]he additional criminal incidents were not necessary to complete either the initial robbery encounter or to escape afterward" and "[d]ifferent evidence was used to prove each robbery incident." 144 Ariz. 591, 595, 597, 699 P.2d 364, 368, 370 (1985), *overruled on other grounds by State v. Noble*, 152 Ariz. 284, 287, 731 P.3d 1228, 1231 (1987).

¶77 Thus, although Ortiz's motive may have been the same in each instance—to engage in illegal sexual conduct with J.V.—that does not necessarily mean each incident was aimed at a single criminal objective. Rather, each act of sexual conduct was distinct from the others, each act did not depend on the completion of the others, it does not appear Ortiz formed the intent to commit the next act of sexual conduct until after the completion of the previous act,

and different evidence was used to prove each incident. *See Perkins*, 144 Ariz. at 597, 699 P.2d at 370; *cf. Noble*, 152 Ariz. 284, n.2, 731 P.2d at 1231 n.2 (single criminal objective where defendant kidnapped child to carry out objective of molesting her); *State v. Sheppard*, 179 Ariz. 83, 84-85, 876 P.2d 579, 580-81 (1994) (single criminal objective where theft of specific car "was motivated by the same criminal objective as the trafficking: to provide the undercover officer with the specific car he ordered."). Consequently, the evidence here shows there was not a "single criminal objective."

¶78      The only *Kelly* factor weighing in favor of finding the offenses occurred on the same occasion is that the victim is the same. That alone, however, is insufficient to support a finding the offenses were committed on the same occasion when they occurred on different dates and at different places. *Cf. Kelly*, 190 Ariz. at 534, 950 P.2d at 1155 ("'[W]hen different crimes . . . are committed at the same place, on the same victim or group of victims, and at the same time,'" they are committed on same occasion.), *quoting State v. Henry*, 152 Ariz. 608, 612, 734 P.2d 93, 97 (1987).

¶79      Based on the evidence, no reasonable jury would have failed to find that counts one and five occurred on separate occasions from counts six and seven. *Miranda-Cabrera*, 209 Ariz. 220, ¶ 30, 99 P.3d at 42; *see also State v. Henry*, 152 Ariz. 608, 611, 734 P.2d 93, 96 (1987) ("The common meaning of the phrase 'same occasion' is same time, same place."). The error was thus harmless beyond a reasonable doubt and Ortiz's sentences were enhanced properly pursuant to § 13-703(A).

## Disposition

¶80      For the foregoing reasons, we affirm Ortiz's convictions and sentences.