NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

MICHAEL DANIEL PING, *Appellant*.

No. 1 CA-CR 17-0826
FILED 3-21-2019

Appeal from the Superior Court in Maricopa County
No. CR2015-141318-001
The Honorable Dean M. Fink, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

The Nolan Law Firm PLLC, Mesa
By Todd E. Nolan, Cari McConeghy Nolan, Vicki A. R. Lopez
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Jennifer B. Campbell joined.

---

**H O W E**, Judge:

**¶1**    Michael Daniel Ping appeals his conviction and sentence for simple assault. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**    This Court views the facts in the light most favorable to sustaining the conviction. *State v. Pena*, 235 Ariz. 277, 279 ¶ 5 (2014). In April 2015, Ping started a romantic relationship with T.C., which lasted about four months. Over that time, T.C. kept some personal belongings at Ping's home, including clothing and medical equipment. Around 5:30 p.m. on August 30, T.C. met some friends at a restaurant to celebrate a friend's birthday. During the birthday dinner, Ping sent T.C. text messages that "[s]tarted out very nice," but later became "nasty and then aggressive." The text messages between 8:17 p.m. and 12:15 a.m. stated:

> **Ping:** Hope [you're] feeling better [] (8:17 p.m.)
>
> **Ping:** We finished dinner and shopping. Having an ice[d] tea and going home soon. Please wish [your friend] happy birthday from me too. (8:19 p.m.)
>
> **T.C.:** Sounds nice. We just finished dinner and now we are on our way to [a] cigar bar [] I'll call you in a little bit (9:07 p.m.)
>
> **Ping:** Okay Luv. (9:10 p.m.)
>
> **Ping:** Think I'm going [to] clean up and chill till you get home. (9:13 p.m.)
>
> **Ping:** Or call me [] maybe [we] could meet up. (9:27 p.m.)
>
> **Ping:** Never mind. Just checking on you. (11:55 p.m.)

**Ping:** Why are you so disrespectful? I'm done. (12:12 a.m.)

**Ping:** I [deserve] better and this is the last straw. (12:13 a.m.)

**Ping:** I don't need this or want this shit. Go have your selfish fun. Bye. (12:14 a.m.)

**Ping:** Later, you deserve better. (12:15 a.m.)

¶3        T.C. left the birthday celebration around midnight, and she did not read Ping's texts until she returned to her car. T.C. arrived at Ping's house and found Ping sitting on a couch in the garage talking on a cell phone. When T.C. entered the garage, Ping became "verbally abusive," accused her of "being with somebody," and called her names. At that point, T.C. was "done with [the relationship]" and started to enter Ping's home to retrieve her belongings. As she did so, Ping "stood up and got in [her] face," began screaming and calling her names, and threw his phone on the floor.

¶4        T.C. continued to enter the home through an internal door located within the garage, but Ping pushed the door and knocked T.C. against a wall inside the house. When T.C. turned around, Ping put his forearm on her throat and pinned her against the wall. She told Ping that she could not breathe, but he did not stop until she "passed out." When T.C. regained consciousness, she found herself slumped down by the wall on the floor with Ping standing over her. T.C. started screaming and tried to get away from Ping by going up a stairway because she could not reach a door on the first floor. Ping grabbed T.C.'s legs, but she was able to break free and get up the stairs.

¶5        T.C. entered a bedroom and tried to shut the door, but Ping "smashed" the door open. He then pinned T.C. onto a bed and again put his arm on her throat. T.C. was able to get Ping off of her by kicking at him, but she was unable to get away because Ping was by the door. Ping then grabbed T.C. by the shoulders and headbutted her two times in the face. During the second headbutt, T.C. moved her head to the side and Ping hit the side of her face near her temple. After the second headbutt, T.C. screamed, which caused Ping to "back[] up a bit." At this point, Ping stopped his attacks.

¶6        Thereafter, T.C. tried to retrieve her medical equipment in the garage, but she stopped when Ping "came at [her] again." T.C. grabbed a vacuum cleaner and used it stop Ping's advance by holding it between

them. Ping then asked T.C. to go back into the house and to sleep in separate rooms so that they could talk about the event the next day. Believing that Ping had calmed down, T.C. fled to her car and immediately drove away.

¶7          T.C. left Ping's gated community, pulled over and called her friends, told them what had happened, and met them at her boss's house. After seeing T.C.'s injuries, her friends took her to a hospital. At the hospital, a nurse contacted the Chandler Police Department to report the domestic-violence incident, and officers were sent to the hospital.

¶8          Officer Scott Lindblad met T.C. at about 4:00 a.m. He saw that T.C. had visible injuries to the left side of her face and neck and that she had bruises to her feet, knees, and elbows. Officer Lindblad called a forensic photographer to the hospital, and the photographer took photos of T.C.'s injuries. T.C. told Officer Lindblad that Ping had (1) punched the left side of her face multiple times; (2) choked her four separate times, but she "saw black" only one time; and (3) headbutted her two times in the face, but she did not specify where exactly on her face.

¶9          Detective George Arias met T.C. at the hospital around 5:00 a.m. Detective Arias saw that T.C. had a "sad [and] upset" demeanor, and he noticed swelling on her face. Detective Arias took T.C. to a police station for an interview. She stated that she had been choked two times and "felt like she was going to black out" one time. She said that Ping had used his forehead to headbutt her face but did not specify which part of her face Ping had headbutted.

¶10          Thereafter, Detective Arias took T.C. to the Scottsdale Family Advocacy Center where a nurse conducted a forensic examination. The nurse charted and photographed T.C.'s injuries, and she found and documented 27 injuries, including contusions, abrasions, petechiae, erythema, and tenderness in the bone between her breasts. The nurse found a contusion on T.C.'s inner lip, which T.C. attributed to Ping having headbutted her in the face. At the time, T.C. did not know how she had received the injury to her left temple. T.C. also stated that Ping had (1) slapped and punched her in the face multiple times, (2) choked her three times and made her "s[ee] black" two times, and (3) headbutted her. The police subsequently arrested Ping.

¶11          In October, Ping was indicted with two aggravated assaults, both class 4 felonies and domestic-violence offenses, and simple assault, a class 1 misdemeanor and domestic-violence offense. The State later dismissed the aggravated-assault counts, and the remaining count was the

simple assault based on Ping's headbutting. Because simple assault does not warrant a jury trial, the matter was tried to the court. *See State ex rel. McDougall v. Strohson*, 190 Ariz. 120, 121 (1997) (simple assault-domestic violence is not a jury-trial offense).

¶12            Before the trial began, Ping moved to preclude the State from presenting evidence of the dismissed counts, both of which alleged strangulation. The court ruled that the course of events, including the strangulation evidence, would help it determine what led to the alleged headbutting and that it would use that information for the limited purposes of credibility and context. It further noted that some of the State's evidence would open the door to evidence Ping may present, which the court would be disinclined to exclude.

¶13            At trial, the forensic nurse testified that T.C. claimed an injury to her inner lip was the result of one of Ping's headbutts. She also opined that a person could sustain an injury around the lip or mouth area from a headbutt. She testified that at the time of the exam, T.C. did not know how she received the injury to her temple. But the nurse provided possible explanations for why her report did not list causes for all 27 injuries that she documented, including the injury to T.C.'s temple. She explained that she does not ask her patients to demonstrate or recreate how each injury occurred and that the speed of an attack sometimes makes patients unable to remember how they received specific injuries.

¶14            Ping offered several self-exculpatory statements during trial. He stated that T.C. arrived at his home while he was talking on the phone and had decided to end their relationship. He then asked T.C. to remove her belongings from his home. He testified that T.C. became agitated and upset and hit him in the face with a vacuum cleaner. He stated that other than trying to prevent himself from being hit by the vacuum cleaner, he never touched T.C. "in any combative form or aggressive manner whatsoever." Ping also testified that he thought T.C. was disrespecting him the night of August 30 and that she had a history of being disrespectful to him. He denied, however, that her disrespect that night agitated him.

¶15            The State impeached Ping's version of the night during cross-examination. The State first showed Ping his texts throughout the night and noted the angry tone of his last messages to T.C. Ping then admitted that he had trained martial arts "on and off" his entire life, yet he was unable to prevent the vacuum cleaner from hitting his face. Last, Ping testified that T.C. had no injuries when she arrived at his home.

¶16        Ping's biomechanics expert witness attempted to impeach T.C.'s claimed injuries by testifying that Ping could not have inflicted T.C.'s injuries in the manner that she reported, including the injuries that resulted from Ping's headbutts to her face. He acknowledged that T.C. claimed that she had suffered an injury to her inner lip from one of Ping's headbutts, which the officers and nurse noted in their reports, but he opined that the injury was inconsistent with a headbutt. He later admitted, however, that Ping could have inflicted T.C.'s inner-lip injury by hitting her face with the bone underlying his eyebrow rather than his forehead.

¶17        The court found Ping guilty of simple assault and sentenced him to unsupervised probation for two years with domestic-violence conditions. Ping timely appealed.

## DISCUSSION

### 1. Admission of Evidence

¶18        Ping argues that the court abused its discretion by allowing the State to present evidence regarding the strangulations underlying its two previously dismissed aggravated-assault charges. "The trial court has considerable discretion in determining the relevance and admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion." *State v. Rose*, 231 Ariz. 500, 513 ¶ 62 (2013) (quoting *State v. Amaya-Ruiz*, 166 Ariz. 152, 167 (1990)). "Abuse of discretion is 'an exercise of discretion which is manifestly unreasonable, exercised on untenable grounds or for untenable reasons.'" *State v. Wassenaar*, 215 Ariz. 565, 570 ¶ 11 (App. 2007) (quoting *State v. Woody*, 173 Ariz. 561, 563 (App. 1992)). This Court views "the evidence in the 'light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect[.]'" *State v. Ortiz*, 238 Ariz. 329, 333 ¶ 5 (App. 2015) (quoting *State v. Harrison*, 195 Ariz. 28, 33 ¶ 21 (App. 1998)).

¶19        When "evidence is so intrinsic to the charged act as to not constitute an 'other' act[,]" Arizona Rule of Evidence ("Rule") 404(b)–(c) does not apply. *State v. Ferrero*, 229 Ariz. 239, 242 ¶ 13 (2012). Evidence is intrinsic if it "(1) directly proves the charged act, or (2) is performed contemporaneously with and directly facilitates commission of the charged act." *Id.* at 243 ¶ 20.

¶20        Here, Ping's strangulations occurred contemporaneously with his headbutts to T.C.'s face. Also, Ping's strangulations escalated the situation to where T.C. felt the need to flee upstairs from Ping and to the bedroom where Ping headbutted her. Thus, Ping's strangulations directly

facilitated the headbutts that occurred in the bedroom. The strangulation evidence meets the second prong of the *Ferrero* test, and Rule 404(b) does not apply. *See id.* at 242–43 ¶¶ 13, 20. As such, the court did not abuse its discretion by admitting the strangulation evidence.

**¶21** Ping claims that the strangulation evidence was irrelevant and prejudicial. The State did not introduce the strangulation evidence to prove Ping's propensity to commit criminal acts. Instead, the strangulation evidence was necessary to explain why T.C. was attempting to flee from Ping, why she ran upstairs to a bedroom, and why Ping headbutted T.C.'s face two times. Furthermore, the evidence was presented to a judge rather than a jury, and the judge explicitly stated that the strangulation evidence was relevant and used for the limited purposes of establishing credibility and context for why Ping would headbutt T.C. Therefore, the evidence was relevant and Ping suffered no prejudice. *See State v. Arellano*, 213 Ariz. 474, 480 ¶ 23 n.5 (2006) ("A trial judge usually will not exclude evidence as unduly prejudicial when the trial is to the court.").

## 2. Sufficiency of the Evidence

**¶22** Ping argues that insufficient evidence supports the court's finding that he was guilty of simple assault. Sufficiency of the evidence is reviewed de novo. *State v. Snider*, 233 Ariz. 243, 245 ¶ 4 (App. 2013). This Court will reverse only if no substantial evidence supports the conviction. *Id.* "Substantial evidence is proof that 'reasonable persons could accept as adequate . . . to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *Id.* (quoting *State v. Bearup*, 221 Ariz. 163, 167 ¶ 16 (2009)). The trial court determines the weight of the evidence and the credibility of witnesses, and this Court does not reweigh the evidence. *State v. Williams*, 209 Ariz. 228, 231 ¶ 6 (App. 2004).

**¶23** Substantial evidence showed that Ping committed assault. As charged here, a person commits assault by "[i]ntentionally, knowingly or recklessly causing any physical injury to another person[.]" A.R.S. § 13–1203(A)(1). At trial, T.C. testified that Ping headbutted her twice during their fight—once on her temple—and that Ping's first headbutt caused the contusion to her inner lip. T.C. told Officer Lindblad and Detective Arias, who had responded to the hospital where she sought treatment for her injuries the night of the assault, that Ping had headbutted her in the face. The forensic nurse documented T.C.'s injured lip and a bruise and swelling on her temple, and the State admitted photographs of T.C.'s injured lip and temple. The nurse testified that T.C. claimed from the outset that one of Ping's headbutts caused her inner-lip injury. The nurse

also testified that a headbutt could cause the injury found on T.C.'s inner lip. Even Ping's own biomechanics expert testified that Ping could have inflicted the lip injury by hitting T.C.'s face with the bone underlying his eyebrow. Therefore, substantial evidence supports Ping's conviction for simple assault based on either headbutt.

¶24 Ping argues that T.C.'s statements to Officer Lindblad, Detective Arias, and the forensic nurse and T.C.'s testimony at trial were inconsistent. Ping notes that T.C. was inconsistent in stating where his hands were while he headbutted her, she did not tell the officers that "in the face" meant anything other than the front of her face, she did not remember how she suffered the temple injury when interviewed by the nurse, and she did not state that she had been headbutted on her temple until trial. Ping also argues that more weight should have been given to the biomechanics expert's testimony, which he contends showed that the inner-lip injury could not have been from a headbutt.

¶25 Ping's argument regarding T.C.'s credibility is not for this Court to address. *See Williams*, 209 Ariz. at 231 ¶ 6. Thus, this argument fails. Likewise, the weight to give the evidence, such as the biomechanics expert's testimony, is not for this Court to determine. *See id.* As such, this argument fails as well, especially when the biomechanics expert admitted that Ping could have inflicted the contusion to T.C.'s inner lip by hitting her face with the bone underlying his eyebrow, and the forensic nurse testified that a headbutt could cause the injury that T.C. suffered.

**CONCLUSION**

¶26 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA